JERROLD M. METCOFF ET AL. *v.* IRENE
LEBOVICS ET AL.
(AC 30954)

Alvord, Flynn and Lavery, Js.

Argued April 15—officially released September 7, 2010

*Suzanne LaPlante*, with whom was *Michael P. Berman*, for the appellants (plaintiffs).

*Edward T. Krumeich*, for the appellees (defendants).

*Opinion*

ALVORD, J. The plaintiffs, Jerrold M. Metcoff and David B. Wilson, appeal from the judgment of the trial court rendered in favor of the defendants, Irene Lebovics, Cy E. Hammond, John J. McCloy II, Sam Oolie and Michael J. Parrella, Sr., granting their motions to strike count two of the plaintiffs' revised complaint and count one of the plaintiffs' second substitute complaint. On appeal, the plaintiffs claim that the court improperly struck both counts, which alleged a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and tortious interference with contractual relations, on the ground that the

counts failed to state a legally sufficient cause of action. We affirm the judgment of the trial court.

The following procedural history and facts, as alleged in the plaintiffs' revised complaint and second substitute complaint, are relevant to our resolution of the issues on appeal. The plaintiffs were majority shareholders of Midcore Software Incorporated. In August, 2000, NCT Group, Inc. (NCT Group), and NCT Midcore, Inc.,[1] a wholly owned subsidiary of NCT Group, entered into an "agreement and plan of merger" (agreement) with the plaintiffs and the remaining minority shareholder of Midcore Software Incorporated. The agreement provided for a merger between Midcore Software Incorporated and NCT Midcore, Inc., with NCT Midcore, Inc., being the surviving corporation. As part of the merger, the agreement provided that the plaintiffs were to receive shares of NCT Group stock and certain royalties on the third anniversary date of the merger.

NCT Group failed to deliver the shares of stock and royalties at the designated time in 2003. The defendants were the executive officers and directors of NCT Group when NCT Group allegedly breached its agreement with the plaintiffs. The plaintiffs claim that NCT Group has been insolvent since 2002 and that, despite the plaintiffs' status as creditors of NCT Group, the defendants have "caused NCT Group to be unable to perform or refrain from performing its obligations to [the] [p]laintiffs under the [a]greement in 2003." Instead, as part of an alleged scheme to further their own interests, the plaintiffs claim that the defendants authorized fraudulent transfers of NCT Group assets, received exorbitant compensation, including bonuses and stock options, and engaged in self-dealing.

On November 25, 2005, the plaintiffs filed a two count complaint against the defendants, claiming that they

---

[1] NCT Midcore, Inc., is now known as Midcore Software, Inc.

breached their fiduciary duties to the plaintiffs, as creditors of NCT Group, and that their actions violated CUTPA. Neither NCT Group nor NCT Midcore, Inc., were named as defendants in the action.[2] On December 21, 2006, the plaintiffs filed a revised complaint, again alleging breach of fiduciary duties in count one and CUTPA violations in count two. The defendants filed a motion to strike both counts of the revised complaint, which the court granted, and the plaintiffs then filed a substitute complaint in which they repleaded count one of the revised complaint and "reserve[ed] their right to appeal the decision to strike [the] second [CUTPA] count."

The substituted first count in the substitute complaint alleged that the defendants' actions constituted a tortious interference with the plaintiffs' rights under their agreement with NCT Group. The plaintiffs claimed that the defendants, as officers and directors of NCT Group, were aware of the corporation's obligations to the plaintiffs under the agreement and that they "intentionally refused to cause delivery to [the plaintiffs] of the requisite number of shares of NCT Group stock due and owing to them under the [a]greement." The defendants filed a motion to strike the count, and the court granted the motion in a memorandum of decision filed February 14, 2008.

On February 29, 2008, the plaintiffs filed their second substitute complaint. Again, they reserved their right to appeal from the court's decision that struck the CUTPA count in their revised complaint. The repleaded count in the second substitute complaint, alleging tortious interference with contractual relations, added allegations that the defendants' actions were outside the

[2] The plaintiffs alleged in their revised complaint that they have commenced a separate action against NCT Group seeking damages in connection with these claims.

scope of their authority as officers and directors of NCT Group and that the failure to cause the issuance of the shares of NCT Group stock to the plaintiffs was part of a scheme to undermine the corporation for their own self- interests. The defendants filed a motion to strike the repleaded count of the second substitute complaint, and the court granted that motion in a memorandum of decision filed November 26, 2008. The court subsequently granted the defendants' motion for entry of judgment in favor of the defendants and rendered judgment thereon. This appeal followed.

The standard of review in an appeal from the granting of a motion to strike is well established. "Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling . . . is plenary. . . . It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted." (Citations omitted; internal quotation marks omitted.) *Doe* v. *Yale University*, 252 Conn. 641, 667, 748 A.2d 834 (2000). "For the purpose of ruling upon a motion to strike, the facts alleged in a complaint, though not the legal conclusions it may contain, are deemed to be admitted." (Internal quotation marks omitted.) *Murillo* v. *Seymour Ambulance Assn., Inc.*, 264 Conn. 474, 476, 823 A.2d 1202 (2003). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 498, 815 A.2d 1188 (2003).

I

The plaintiffs claim that the court improperly struck count two of their revised complaint which alleged that

the defendants engaged in conduct that violated CUTPA. Specifically, the plaintiffs argue that CUTPA should be interpreted to permit a cause of action against individuals acting in a corporate or agent capacity, provided the cause of action otherwise satisfies the criteria for a cognizable CUTPA claim. We conclude that the plaintiffs failed to state a legally sufficient cause of action under CUTPA.

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices *in the conduct of any trade or commerce*. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness." (Emphasis added; internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350, 994 A.2d 153 (2010).

In the CUTPA count of their revised complaint, the plaintiffs alleged that they were creditors of NCT Group, that the defendants owed a fiduciary duty to them as creditors of NCT Group,[3] that the defendants preferred

---

[3] As previously noted, the court struck the first count of the plaintiffs' revised complaint that alleged breach of fiduciary duties. The plaintiffs did not replead that cause of action in any subsequent amended complaints.

themselves in the form of large salaries and benefits to the detriment of the plaintiffs, that the defendants acted out of self-interest and in bad faith, and have engaged in self-dealing as the directors and officers of NCT Group when NCT Group was insolvent. The plaintiffs also alleged that the defendants have refused to deliver the shares of stock due and owing to them under the agreement with NCT Group, that the conduct of the defendants occurred in their primary business, trade or commerce and that the aforesaid conduct was unfair, deceptive and unscrupulous. The gravamen of the plaintiffs' CUTPA claim is that the defendants refused to cause NCT Group to fulfill its obligations under the agreement for personal and wrongful reasons.

In its memorandum of decision filed August 16, 2007, the court concluded that the plaintiffs' revised complaint, contrary to the legal conclusions stated therein, failed to allege any facts to support the claim that the defendants' conduct involved trade or commerce as defined in CUTPA. The plaintiffs had argued that the alleged conduct impacted trade or commerce because it concerned NCT Group's relationship with its creditors and, in particular, NCT Group's ability to pay the plaintiffs. The court disagreed and noted that the plaintiffs had failed to distinguish between the corporate acts of NCT Group and the decisions of the individual defendants that caused those acts: "[T]he plaintiffs' argument . . . obliterates the corporate shield so that any act of the corporation may be attributed to its directors or officers so that the latter may be held liable under CUTPA."[4] The court recognized that there are circumstances under which the individual acts of a corporate officer or director may form the basis of a CUTPA claim, but it concluded that the plaintiffs did not allege facts to support such a claim.

---

[4] The revised complaint did not allege the criteria necessary for piercing the corporate veil, and the plaintiffs did not seek that relief from the court.

Here, the defendants, as officers and directors of NCT Group, were providing services to NCT Group, not the plaintiffs. It is well settled that purely intracorporate conflicts do not constitute CUTPA violations. *Ostrowski* v. *Avery*, 243 Conn. 355, 379, 703 A.2d 117 (1997); *Russell* v. *Russell*, 91 Conn. App. 619, 647, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005). Our Supreme Court has distinguished, however, internal corporate actions that also have the effect of usurping the customers, employees or assets of one business in favor of another business. *Ostrowski* v. *Avery*, supra, 379. In the present case, the plaintiffs did not allege that the defendants personally engaged in any business or commercial activity in competition with the plaintiffs. Accordingly, the present matter involves purely intracorporate matters, and the plaintiffs failed to allege any facts in their revised complaint that would satisfy CUTPA's requirement that the defendants' conduct implicated trade or commerce.

## II

The plaintiffs also claim that the court improperly struck count one of their second substitute complaint which alleged that the defendants engaged in conduct that constituted a tortious interference with the plaintiffs' rights under the agreement with NCT Group. The plaintiffs argue that the defendants' conduct was outside the scope of their authority as NCT Group officers and directors because they "refus[ed] to cause NCT Group to deliver the requisite shares" of stock to the plaintiffs "solely in order to benefit themselves in the form of stock options or warrants, excessive salaries, bonuses and other benefits." We conclude that the plaintiffs failed to state a legally sufficient cause of action for tortious interference with contractual relations under the circumstances of this case.

"A claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Rioux* v. *Barry*, 283 Conn. 338, 351, 927 A.2d 304 (2007). "[N]ot every act that disturbs a contract or business expectancy is actionable. . . . [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." (Internal quotation marks omitted.) *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 502 n.24, 656 A.2d 1009 (1995).

"However, it is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two *other* parties." (Emphasis in original; internal quotation marks omitted.) *Wellington Systems, Inc.* v. *Redding Group, Inc.*, 49 Conn. App. 152, 168, 714 A.2d 21, cert. denied, 247 Conn. 905, 720 A.2d 516 (1998). "[T]here can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract. [T]he general rule is that the agent may not be charged with having interfered with a contract of the agent's principal." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 53 Conn. App. 252, 267, 730 A.2d 88 (1999), rev'd in part on other grounds, 254 Conn. 205, 757 A.2d 1059 (2000). "[A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect,

to hold the corporation liable in tort for breaching its own contract . . . ." (Internal quotation marks omitted.) *Wellington Systems, Inc.* v. *Redding Group, Inc.*, supra, 168. In other words, an exception to the general rule applies if the agent "did not act legitimately within his scope of duty but used the corporate power improperly for personal gain." (Internal quotation marks omitted.) Id.

In their second substitute complaint, the plaintiffs alleged that they had entered into a contractual relationship with NCT Group, that the defendants were aware of the existence of that contractual relationship, that the defendants entered into a fraudulent scheme to deprive the plaintiffs of their rights under the merger agreement for the sole purpose of ensuring that they would receive exorbitant salaries, stock options and other benefits, that the defendants caused NCT Group to become a mere conduit for their own mutual benefit and self-interests, and that such actions were not within the scope of the defendants' duties as officers and directors of NCT Group. Again, the gravamen of the plaintiffs' claim is that the defendants refused to cause NCT Group to fulfill its obligations under the merger agreement for personal and wrongful reasons.

In its memorandum of decision, the court concluded that the plaintiffs' second substitute complaint, contrary to the legal conclusions stated therein, failed to allege any facts to support the claim that the defendants did not act legitimately within the scope of their duties as officers and directors of NCT Group. The court stated that the plaintiffs failed to recognize that the wrongful *use* of authority does not necessarily mean that the conduct was outside the *scope* of that authority. The decision to issue or to not issue stock, the court noted, clearly was within the scope of the defendants' authority: "[T]he court simply cannot conclude on the basis of any of the complaint's specifically alleged facts that

a decision not to issue the shares of stock was so inimical and hostile to any conceivable interest of NCT Group that this failure to act was outside of the defendants' authority. The defendants had the authority to make this decision, even though, according to the allegations of the complaint, they abused it." Accordingly, the court concluded that the plaintiffs' cause of action should be stricken because holding the defendants liable effectively would be holding NCT Group liable in tort for allegedly breaching its own contract by failing to issue the shares of stock.

The court properly struck count one of the second substitute complaint. The plaintiffs have failed to allege facts that would support their legal conclusion that the defendants' conduct in refusing to issue the shares of stock to the plaintiffs was outside the scope of their duties as officers and directors of NCT Group. "In determining whether an employee has acted within the scope of employment, courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Harp* v. *King*, 266 Conn. 747, 782–83, 835 A.2d 953 (2003).

"If the measure of the applicability of [the intracorporate conspiracy] doctrine was keyed to the alleged wrongdoing of corporate officers, it would quickly become a meaningless concept. In every case of conspiracy . . . there are necessarily accusations of wrongful conduct. The test [therefore] is not the wrongful nature of the conspirators' actions but whether the wrongful conduct was performed within the scope of the conspirators' official duties. . . . An employee acts within the scope of his employment as long as he is discharging his duties or endeavoring to do his job, no matter how irregularly, or with what disregard of

instructions." (Citation omitted; internal quotation marks omitted.) Id., 785–86.[5]

There are no allegations in the plaintiffs' second substitute complaint that a "refusal to cause" shares of stock to be issued, whether to the plaintiffs or to any other individual or entity, is conduct that falls outside of the scope of the defendants' duties as officers and directors of NCT Group. Instead, the plaintiffs have ascribed sinister motivations to conduct taken in the normal course of corporate management. The second substitute complaint contains no allegations that the defendants affirmatively used their corporate power to interfere with the contractual relations between the plaintiffs and NCT Group. It is the passive act of not authorizing shares to be issued to the plaintiffs as creditors, characterized as fraudulent and self-dealing, that forms the basis of the plaintiffs' claims. Instead of issuing shares of stock to the plaintiffs, the defendants made decisions that resulted in the payment of salaries and benefits to themselves and the corporation's employees. In so doing, there are no allegations that these decisions were concealed or made at a time, place or manner other than in the course of the business normally transacted by corporate management. Conclusory allegations of improper motivation are not sufficient in the absence of well pleaded facts to support them. *Fort Trumbull Conservancy, LLC* v. *Alves*, supra, 262 Conn. 498. We conclude, therefore, that the court correctly determined that the plaintiffs failed to plead a cognizable tortious interference with contract claim

[5] As in *Harp* v. *King*, supra, 266 Conn. 778, the plaintiffs' second substitute complaint does not contain the term "conspiracy." Nevertheless, we conclude, as the Supreme Court concluded in *Harp*; id., 785–86; that the plaintiffs have alleged a civil conspiracy and that the intracorporate conspiracy doctrine bars their claim. In the present case, the plaintiffs alleged that the defendants' conduct "constituted a fraudulent scheme, outside the [d]efendants' scope of authority . . . ."

and properly struck count one of the second substitute complaint.

The judgment is affirmed.

In this opinion FLYNN, J., concurred.

LAVERY, J., concurring in part and dissenting in part. Although I agree with part I of the majority opinion, I respectfully disagree with part II. In my opinion, the plaintiffs, Jerrold M. Metcoff and David B. Wilson, have alleged sufficient facts in their complaint to support their legal claim that the defendants' conduct in refusing to issue the shares of stock to the plaintiffs was outside the scope of their duties as officers and directors of NCT Group. The defendants are Irene Lebovics, Cy E. Hammond, John J. McCloy II, Sam Oolie and Michael J. Parrella, Sr. Accordingly, I respectfully dissent from part II in which the majority concludes that the trial court correctly found that the plaintiffs failed to plead a cognizable tortious interference with contract claim and, thus, properly struck count one of the second substitute complaint.

As the majority notes, the standard of review in an appeal from the granting of a motion to strike is well established. "A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 154, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). "For the purpose of

ruling upon a motion to strike, the facts alleged in a complaint, though not the legal conclusions it may contain, are deemed to be admitted." (Internal quotation marks omitted.) *Murillo* v. *Seymour Ambulance Assn., Inc.*, 264 Conn. 474, 476, 823 A.2d 1202 (2003). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 498, 815 A.2d 1188 (2003).

"A claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Rioux* v. *Barry*, 283 Conn. 338, 351, 927 A.2d 304 (2007). "It has long been considered tortious either to induce a breach of contract or to interfere with financial expectancies. . . . However, it is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two other parties." (Internal quotation marks omitted.) *Wellington Systems, Inc.* v. *Redding Group, Inc.*, 49 Conn. App. 152, 168, 714 A.2d 21, cert. denied, 247 Conn. 905, 720 A.2d 516 (1998). Thus, in Connecticut the "general rule is that the agent may not be charged with having interfered with a contract of the agent's principal. . . . [A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract . . . [the agent, however,] could be held liable for such interference or inducement if *he did not*

*act legitimately within his scope of duty but used the corporate power improperly for personal gain.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *Appleton* v. *Board of Education*, 53 Conn. App. 252, 267, 730 A.2d 88 (1999), rev'd in part on other grounds, 254 Conn. 205, 757 A.2d 1059 (2000).

In considering the facts to be those alleged in the complaint and construing the complaint in the manner most favorable to sustaining its legal sufficiency, the plaintiffs have made out a prima facie case for tortious interference with contractual relations. The dispositive issue for the court was its determination that finding the defendants liable would effectively be holding NCT Group liable in tort for allegedly breaching its own contract by failing to issue the shares owed to the plaintiffs. More specifically, the court concluded that "the decision not to issue the shares was the type of decision that the defendants were employed or retained to perform in order for there to be a corporate act, and the court simply cannot conclude on the basis of any of the complaint's specifically alleged facts that a decision not to issue the shares of stock was so inimical and hostile to any conceivable interest of NCT Group that this failure to act was outside of the defendants' authority." In light of our scope of employment jurisprudence, however, I do not agree with this result.

"In determining whether an employee has acted within the scope of employment, courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer. . . . Ordinarily, it is a question of fact as to whether a wilful tort of the servant has occurred within the scope of the servant's employment . . . [b]ut there are occasional cases [in which] a servant's digression from [or adherence to] duty is so clear-cut

that the disposition of the case becomes a matter of law." (Citation omitted; internal quotation marks omitted.) *Harp* v. *King*, 266 Conn. 747, 782–83, 835 A.2d 953 (2003). Under the intracorporate conspiracy doctrine, a doctrine the majority cites to, the test is not the "wrongful nature of the conspirators' actions but whether the wrongful conduct was performed within the scope of the conspirators' official duties. . . . An employee acts within the scope of his employment as long as he is discharging his duties or endeavoring to do his job, no matter how irregularly, or with what disregard of instructions." (Citation omitted; internal quotation marks omitted.) Id., 785–86.

In *Harp*, the plaintiff, a real estate developer and architect, argued on appeal that the trial court improperly granted the motions for summary judgment filed by the defendants, employees of the Connecticut Housing Finance Authority (authority), because his claims were not barred by the intracorporate conspiracy doctrine. Specifically, he argued that his claims were not barred because the defendants were not acting within the scope of their employment when they engaged in their allegedly tortious conduct. Id., 782. Our Supreme Court disagreed and affirmed the judgment by concluding that "there is nothing in the record from which a fact finder could conclude that the defendants' allegedly tortious conduct had occurred outside the scope of their employment." Id., 783. Although the plaintiff submitted some evidence that tended to support his claim of disparate and unfair treatment, the court stated that he failed to explain why the defendants' actions fell outside the scope of the defendants' employment, even though all of those actions were undertaken in the discharge of their official duties and in the furtherance of the authority's business. Id., 785. Consequently, our Supreme Court determined that the plaintiff's contention that the

defendants were not acting within the scope of their employment was without merit.

The case before us is easily distinguishable from *Harp*. Here, the plaintiffs specifically alleged that the defendants entered into a fraudulent scheme with an outside lender that was designed to deprive the plaintiffs of their rights under the merger agreement for the sole purpose of ensuring that the defendants would receive exorbitant salaries, stock options and other benefits—the scheme, according to the plaintiffs, had nothing to do with the interests of NCT Group, an insolvent corporation. The capital to fund the fraudulent scheme came from an outside lender to NCT Group. Pursuant to the scheme, NCT Group would next default on the outside lender's notes, eventually resulting in the conversion of the notes into more shares of NCT Group stock without the lender providing additional capital. On account of these loan transactions, the lender came to own substantially more shares of NCT Group stock than the corporation was authorized to issue. The lender dictated that the capital loaned to NCT Group was to be used principally by the defendants to fund their exorbitant compensation plan that was comprised of, inter alia, salaries, benefits, stock options and warrants. In turn, the defendants continued to grant these pyramiding stock options, warrants and rights to the lender so that if the company, as a result of this fraudulent scheme, was subsequently sold or merged, the defendants would be rewarded with a golden parachute. Thus, the defendants utilized the royalties owed to the plaintiffs in order to keep this scheme functioning.

The defendants' self-dealing caused NCT Group to cease to function as an independent entity and was replaced by an organization that served as a mere conduit for the defendants' own mutual benefit and self-interests. The plaintiffs alleged that such intentional, unauthorized self-dealing was in fact destructive of the

interests of NCT Group and beyond the defendants' charged responsibilities and authority as officers or directors. In light of the foregoing, the plaintiffs stated in their second substitute complaint that the "[d]efendants acted outside the scope of their authority as NCT Group directors and officers for self gain, without regard for the consequences of their actions, without regard for NCT Group's obligations under the [a]greement, without regard for the injuries, damages, and losses their wrongful conduct would cause to [the] [p]laintiffs, and in a manner totally devoid of any motivation or purpose to serve NCT Group, in refusing to cause delivery of said shares [owed] to the [p]laintiffs [under the agreement]."

Given these allegations, I do not agree with the court's conclusion that the plaintiffs failed to allege any facts to support the claim that the defendants did not act legitimately within the scope of their duties as officers and directors of NCT Group. Although I agree with the majority that the plaintiffs did not narrowly frame their allegations to aver that the defendants' "refusal to cause" shares of stock to be issued is conduct that falls outside the scope of their duties as officers and directors of NCT Group, this conclusion is not dispositive of the appeal. Rather, a corporate agent may be deprived of the immunity afforded to him by his status if he employed corporate power solely for his own benefit rather than for corporate purposes. See *Walsky* v. *Gastaldi*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-89-0101368-S (July 26, 1990). To hold otherwise would allow any corporate agent, despite the severity of the allegations of self-dealing, to escape liability under a tortious interference with contract action by claiming that he possessed the general power through his employment position to make the decision or, alternatively, to refrain from performing the act at issue.

I would hold that under the specific facts as pleaded in this case the defendants exceeded the scope of their employment by declining to issue the plaintiffs' shares due under the merger agreement solely to line their own pockets at the direct expense of NCT Group. The plaintiffs have sufficiently explained why such actions are not confined within the authorized functions the defendants were charged with performing. Accordingly, I conclude that the trial court improperly granted the defendants' motion to strike count one of the second substitute complaint and I would reverse the judgment and remand the case to the trial court for further proceedings according to law.