******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SYSTEM PROS, INC., ET AL. *v.* GENE KASICA
(AC 37105)

Gruendel, Lavine and Beach, Js.*

*Argued February 16—officially released July 12, 2016*

(Appeal from Superior Court, judicial district of Hartford, Hon. Richard M. Rittenband, judge trial referee.)

*Michelle M. Seery*, with whom was *William J. O'Sulli-van*, for the appellant (defendant).

*Peter A. Ventre*, for the appellee (plaintiff Robert J. Majewicz).

*Opinion*

GRUENDEL, J. This appeal concerns the disintegration of a business relationship. The defendant, Gene Kasica, appeals from the judgment of the trial court in favor of the plaintiff Robert J. Majewicz[1] on all eight counts of the operative complaint. On appeal, the defendant challenges the propriety of the court's award of damages in numerous respects. Specifically, he claims that the court improperly awarded the plaintiff (1) one half of the value of System Pros, Inc. (corporation), as that corporation was valued on December 31, 2012, (2) $467,786 in lost wages, (3) $18,149 attributable to certain tax penalties the plaintiff sustained as a result of the defendant's actions, (4) $103,835 in obligations that the court found the plaintiff owed his former wife in his marital dissolution proceeding, (5) $326,864 in prejudgment interest pursuant to General Statutes § 37-3a, and (6) damages for violating the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendant also argues that, should he prevail on the aforementioned claims, the court's supplemental judgment awarding the plaintiff $146,440 in attorney's fees should be vacated. We affirm in part and reverse in part the judgment of the trial court.

In its memorandum of decision, the court found the following facts. The parties formed the corporation "on or about January 12, 1993, for the purpose of supplying consulting services, particularly in the areas of computers and computer software to insurance companies. . . . Each owned . . . fifty percent of the stock of [the] corporation. They were and are the only members of [its] board of directors. [The plaintiff] was elected president and treasurer, and [the defendant] vice president and secretary. The division of duties and responsibilities of the corporation were that [the defendant] would be in charge of marketing and sales, and [the plaintiff] would be in charge of administration of the corporation, although [the plaintiff] was to be assigned by the corporation to do consulting work for various insurance companies. This division of duties and responsibilities was admittedly oral but performed by each party. It has been contested by [the defendant] that there was such an agreement. However, this court after listening to the testimony, in particular the testimony [of] James Valenski . . . who testified that he was an independent contractor hired by the corporation and, during the time that he was so involved, that he fully understood that the division of responsibility was as set forth above. The court also believes [the plaintiff] as to this arrangement and finds such arrangement to have taken place. When [the plaintiff] did consulting work for an insurance company, his income from that consulting work would go into his account, and when [the defendant] did consulting work for an insurance company, his income went into his account. There was

also an account for work done by employees/independent contractors which would go into a corporate account which would then be divided between [the plaintiff] and [the defendant] after payment of expenses.

"This arrangement worked quite well and was financially profitable for both individuals up until 2009 when [the defendant], unhappy with [the plaintiff], took over the corporation and in effect locked [the plaintiff] out of any further dealings involving [the corporation]. [The plaintiff] was no longer allowed on the premises, and, as of the end of 2009, he became a nonentity as far as [the defendant] and the corporation were concerned. There is no question that the individuals no longer trusted each other and were very critical of each other, which has led this court to grant an application of dissolution of the corporation. There were personality differences and differences as to how the operation of the corporation was being conducted. . . . Part of the problem between the parties was that [the defendant] wanted to make Valenski a member and/or partner of the corporation to which [the plaintiff] objected. Valenski was hired as an independent contractor to promote marketing and sales and develop clients for himself and clients [for] whom [the defendant] and [the plaintiff] would perform consulting work. [The plaintiff] believed that Valenski was doing work that was really the responsibility of [the defendant]. Although [the plaintiff] objected to retaining Valenski, he signed the contract between [the corporation] and Valenski as the president of [the corporation], thereby approving the independent contract with Valenski. [The parties] were unable to work out their differences . . . ."

In late October, 2009, the defendant commenced an action to dissolve the corporation pursuant to General Statutes § 33-896 (dissolution action). The plaintiff at that time declined his option to purchase all shares owned by the defendant pursuant to General Statutes § 33-900. The plaintiff also declined the defendant's offer to appoint a receiver to operate the corporation while the dissolution action was pending. The plaintiff thereafter filed an answer and counterclaim.[2]

In February, 2010, the plaintiff commenced the present action. The operative complaint, the plaintiff's January 30, 2014 amended complaint, contained eight counts. The first count sought an accounting, and the second count alleged tortious interference with business relationships. Counts three through six alleged that the defendant breached a fiduciary obligation, an implied covenant of good faith and fair dealing, the standards of a corporate director under General Statutes § 33-756, and the standards of a corporate officer under General Statutes § 33-765. In count seven, the plaintiff alleged a CUTPA violation. The eighth and final count alleged that the defendant breached an oral con-

tract between the parties. On March 8, 2010, the court granted a motion to consolidate that action with the dissolution action.

By order dated October 19, 2012, the court appointed Attorney Atherton B. Ryan as custodian of the corporation and certified public accountants Bart Giustina and Bruno Passacantano as auditors thereof, as well as a third auditor to be determined by agreement of the parties.[3] Those auditors were directed to "reconcile the books and records of [the corporation] from October 1, 2009, to date . . . . In addition, each of the auditors shall independent of one another determine the [corporation's] fair value as of October 1, 2009, and a current date on or before January 31, 2013. The auditors shall file a report with the court of their findings by February 15, 2013."

A court trial commenced in June, 2013. Although consolidated four years earlier, the court bifurcated the trials of the dissolution action and the present action. The court first conducted a trial on the dissolution action over the course of four days. It thereafter rendered a judgment that dissolved the corporation in accordance with General Statutes § 33-897 et seq., and designated Ryan as the receiver charged with winding up and liquidating the business and affairs of the corporation. The propriety of that judgment is not contested in this appeal.

Trial of the present action began on October 30, 2013, and was continued over ten additional days. All but two days consisted of the testimony of the plaintiff. The defendant did not testify, but the court did hear the testimony of Giustina, Passacantano, Philip J. DeCaprio, Jr., Valenski, and Attorney Douglas Manion. In its memorandum of decision, the court found that the plaintiff "was a very credible and honest witness. . . . [H]e was particularly honest, candid and forthcoming." The court also credited the testimony of DeCaprio, finding that "[h]e was devoid of any bias and was independent, and he gave a good basis for his evaluation of the [corporation]." The court credited Valenski's testimony as it pertained to the affairs of the corporation and credited Passacantano's testimony on the "sole point" of whether the plaintiff "had to cash in his 401 (K) and/ or IRAs and suffered a penalty" due to "his involuntary departure from [the corporation] . . . ." The court did not credit the testimony of Giustina or Manion.

In its July 30, 2014 memorandum of decision, the court concluded that the defendant was liable to provide an accounting of the corporation. The court also ruled in favor of the plaintiff on counts two through eight of the operative complaint while rejecting the defendant's statute of limitations and laches special defenses. With respect to damages, the court reiterated that it found the plaintiff "credible and trusts his valuation of the damages he suffered as set forth in [his]

exhibit 87 with any exceptions described herein. [The plaintiff's] testimony and his list of damages, as well as the basis and computation thereof, the court finds to be credible."[4] The court then summarized its award of damages as follows: "(1) Lost Wages – $467,786; (2) Half of the value of the corporation as of December 31, 2012 – $86,500; (3) Penalties re: 401 (K) and IRAs – $18,149; (4) Obligations [the plaintiff] has to fulfill pursuant to the marriage dissolution case of *Majewicz* v. *Majewicz* – $103,835; (5) Sua sponte interest at 10 percent per annum, for money wrongfully withheld pursuant to [§] 37-3a from November 1, 2009 to August 1, 2014 – $326,864 [for a total of] $1,003,134." The court also awarded the plaintiff punitive damages in the form of attorney's fees, noting that "[a] supplemental judgment will be rendered following the hearing on attorney's fees and receipt of [an updated audit of the books and records of the corporation from DeCaprio] for the period January 1, 2013 to date, the request to [have DeCaprio complete that audit] having been by stipulation of the parties."

Following that hearing, the court, on August 28, 2014, awarded the plaintiff the sum of $146,440 in attorney's fees. In a report dated September 5, 2014, DeCaprio provided the court an updated analysis of the books and records of the corporation, which was accompanied by a detailed "Schedule of Adjustments." That analysis concluded that there existed "a financial obligation in favor of [the plaintiff] in the amount of $140,322.55." On September 30, 2014, the court rendered a supplemental judgment in favor of the plaintiff, which reflected both the $146,440 award of attorney's fees and the $140,322.55 award on the audit of the corporation, as documented in DeCaprio's report. The court thus concluded that "[j]udgment is hereby entered in favor of [the plaintiff] against [the defendant for a total of] $1,289,895.55." This appeal followed.

Before considering the specific claims advanced by the defendant in this appeal, we first note what is not in dispute. In its July 30, 2014 memorandum of decision, the court determined, inter alia, that the defendant was liable on counts one through six for providing an accounting of the corporation, interfering with the plaintiff's business relationships, breaching his fiduciary obligation to the plaintiff, breaching the implied covenant of good faith and fair dealing between the parties, breaching the standards of a corporate director under § 33-756, and breaching the standards of a corporate officer under § 33-765. In this appeal, the defendant does not contest his liability on those counts. In addition, the court expressly found "that the actions of the corporation, once [the defendant] took control thereof, were the actions of [the defendant] on the basis that his conduct pierced the corporate veil. . . . [T]his court finds that the corporate veil was pierced and that [the defendant] was an alter ego of the corporation

and that [the defendant] is individually liable to [the plaintiff] . . . for all actions of himself and of [the corporation]." That determination also is not challenged in this appeal.

We further note the standard of review that governs challenges to damages awards. "[T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Russell* v. *Russell*, 91 Conn. App. 619, 643, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005). "When, however, a damages award is challenged on the basis of a question of law, our review . . . is plenary." (Internal quotation marks omitted.) *Landry* v. *Spitz*, 102 Conn. App. 34, 49–50, 925 A.2d 334 (2007).

I

The defendant first claims that the court improperly awarded the plaintiff one half of the value of the corporation, as it was valued by DeCaprio as of December 31, 2012, as part of its award of damages on the accounting count of the operative complaint.[5] We agree.

The following additional facts are relevant to this claim. The first count of the operative complaint sought an accounting of the corporation. On October 19, 2012, the parties appeared before the court to submit a proposed order regarding the appointment of three auditors in connection therewith. After brief discussion on the language employed, the court approved the order largely "as submitted by counsel for all parties . . . ." That order stated in relevant part that "[a]n accounting of [the corporation] . . . is warranted." The order then assigned the auditors two distinct tasks. First, the auditors were to "reconcile the books and records" of the corporation. Second, each auditor was charged with rendering a valuation of the corporation as of both "October 1, 2009, and a current date on or before January 31, 2013." A review of both the transcript of the October 19, 2012 proceeding and the court order entered on that date confirms that two distinct issues were before the court with respect to the accounting count of the operative complaint. First, the plaintiff sought an audit of the books, records, and assets of the corporation. Second, the plaintiff sought a valuation of the corporation.

The proper valuation of a corporation "presents a factual determination subject to the clearly erroneous standard." *Russell* v. *Russell*, supra, 91 Conn. App. 643. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Murtha* v. *Hart-*

*ford*, 303 Conn. 1, 12–13, 35 A.3d 177 (2011).

It is undisputed that the plaintiff owned 50 percent of the stock of the corporation. It further is undisputed that the defendant was liable for his tortious conduct under counts two through six of the complaint, which transpired, the court found, once the defendant seized control of the corporation and effectively locked the plaintiff out. As an equal shareholder in the corporation, the plaintiff plainly had a compensable interest in the corporation. Indeed, the defendant does not argue otherwise.

The question, then, is whether the court erred in awarding the plaintiff the sum of $86,500 as compensation for his one-half interest of the corporation, as it was valued as of December 31, 2012, by DeCaprio in his February 25, 2013 report.[6] In his report, DeCaprio valued the corporation at $81,000 as of October 1, 2009, and at $173,000 as of December 31, 2012. Admittedly, DeCaprio's report complied with the October 19, 2012 order of the court to "determine the [corporation's] fair value as of October 1, 2009, and a current date on or before January 31, 2013." The court nevertheless provided no explanation for its decision to impose damages in accordance with the later date in either its July 30, 2014 memorandum of decision or its June 19, 2015 articulation.[7]

In his February 25, 2013 report, DeCaprio expressly indicates that "[t]he standard of value used in [his] valuation" was that set forth in General Statutes § 33-855 (4), which provides in relevant part that " 'fair value' means the value of the corporation's shares determined: (A) Immediately before the effectuation of the corporate action to which the shareholder objects . . . ." The corporate action to which the plaintiff, as a shareholder, objected was the commencement of the dissolution action and related conduct of the defendant that began on October 30, 2009. Consistent with the standard of value employed by DeCaprio, the proper valuation in the present case was his valuation of the corporation as of October, 2009.

That determination is consonant with the testimony of the plaintiff. At trial, the plaintiff agreed that the proper valuation date was the fall of 2009, rather than December, 2012. He testified that, as part of his claim for damages, he was seeking half of the value of the corporation as of November, 2009. When asked by his attorney why he was not "going to give any adjustment for the valuation as of December 31, 2012," the plaintiff answered, "[b]ecause if the [corporation] is dissolved, the value is zero, so therefore the damages are half the value of the corporation as of November 2, 2009." When his attorney then inquired as to precisely what his claim for damages was, the plaintiff testified, "half the value of what [the corporation] was in November [of] 2009."

In light of both the standard of value employed by DeCaprio in his valuation of the corporation and the unequivocal testimony of plaintiff at trial, we are left with a definite and firm conviction that a mistake has been committed with respect to the proper valuation of the corporation. Accordingly, the plaintiff's recovery for one half of the value of the corporation must be reduced from $86,500 to $40,500, which figure represents half of the $81,000 valuation of the corporation, as of October, 2009, furnished by DeCaprio.[8]

## II

The defendant next challenges the award of $467,786 in lost wages, claiming that the plaintiff failed to establish this award with reasonable certainty. By contrast, the plaintiff maintains that his testimony at trial, in tandem with the documentary evidence he submitted, substantiates the award for lost wages. We agree with the defendant.[9]

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 441, 78 A.3d 76 (2013). "[T]he court must have evidence by which it can calculate the damages, which is not merely subjective or speculative . . . but which allows for some objective ascertainment of the amount. . . . This certainly does not mean that mathematical exactitude is a precondition to an award of damages, but we do require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate. . . . Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion." (Citations omitted; internal quotation marks omitted.) *Weiss* v. *Smulders*, 313 Conn. 227, 254, 96 A.3d 1175 (2014).

As the court found in its memorandum of decision, the corporation supplied consulting services to insurance companies. The plaintiff and the defendant equally divided the profits of the corporation, which resulted primarily from the placement of other consultants in service contracts.[10] The plaintiff retained all earnings from consulting services that he personally rendered to clients, which earnings were not considered profits of the corporation. In addition, the plaintiff never received a salary from the corporation. As he testified at trial, "[t]he only compensation [he] ever received was 50 percent of the profits" of the corporation.

The plaintiff's claim for lost wages is predicated on

his allegation, which the court credited, that the defendant failed to disclose available consulting positions to the plaintiff after locking him out of the corporation in late 2009. The plaintiff testified that, prior to 2009, he routinely received e-mail communications regarding existing or potential clients that were looking for consultants. As he stated, "I was regularly contacted and given information about positions that were available to [the corporation] both from the standpoint if I wished to have a position or if I knew somebody that could be used to fill one of the positions." The plaintiff also testified that, once the defendant seized control of the corporation, he no longer received such communications, stating that he was "cut off from everything at the end of 2009."

Critical to our analysis are three pieces of documentary evidence that the plaintiff introduced at trial in support of his claim for lost wages. First, the plaintiff submitted exhibit 70, which is a document he prepared that lists "various individuals [who] were placed at [the corporation's] clients" from August 1, 2009 to June 30, 2013. That document includes a total of twenty-one placements and notes the start and end dates of each placement, as well as the hourly rate of compensation. The rate of compensation varied for each placement and ranged from $63 to $100 per hour. Second, more than 300 pages of invoices from the corporation regarding those placements were admitted as exhibit 71.

Third, the plaintiff introduced a detailed spreadsheet, admitted as exhibit 75, that he had prepared titled "Lost Wages January 1, 2010 to November 1, 2013." For every week during that period, the document specifies an amount of lost wages, predicated on a forty hour work week and calculated at an hourly rate of $85 for weeks in which he was unemployed, and at an hourly rate of $35 for weeks in which he allegedly was underemployed.[11] The sum of lost wages specified on that document is $533,400.[12]

The plaintiff augmented that documentary evidence with his testimony at trial. He testified that he "created [exhibit 75] out of an Excel spreadsheet for the time period that I was unemployed or underemployed and the amount of time I would have lost as a result of being locked out of [the corporation]. . . . Exhibit 70 shows that there were numerous jobs that were available to me during that period of time that I was not given an opportunity to apply for . . . and this is the amount of money that I would have lost as a result of not having those jobs." The plaintiff testified that he calculated his rate of compensation at $85 per hour, which was a rate he previously received from a prior client.[13] The plaintiff also opined that exhibit 75 represented a summary of hours that he would have been able to work had "all of the openings that were available" been disclosed to him. In awarding the plaintiff

$467,786 in damages for lost wages, the court credited the plaintiff's "testimony and his list of damages, as well as the basis and computation thereof . . . ."

Assuming arguendo that the court properly determined that the defendant breached an agreement to disclose available consulting positions to the plaintiff, as the plaintiff alleged in the operative complaint,[14] there nonetheless remains an enormous evidentiary gap between that improper conduct and the $467,786 award for lost wages. Although the plaintiff presented ample evidence regarding the nature of the opportunities for employment that were not communicated to him, his testimony as to whether he would in fact have secured such employment resorted to conjecture and subjective opinion, which cannot constitute the basis for an award of damages. See *American Diamond Exchange, Inc.* v. *Alpert*, 302 Conn. 494, 513, 28 A.3d 976 (2011) ("the plaintiff bears the burden of producing evidence of sufficient quality to permit the fact finder to award damages without resort to conjecture or speculation"); *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 76, 717 A.2d 724 (1998) ("[i]n order to remove the assessment of damages from the realm of speculation, it is necessary to tie the award of damages to objective verifiable facts"); *Viejas Band of Kumeyaay Indians* v. *Lorinsky*, 116 Conn. App. 144, 163, 976 A.2d 723 (2009) ("[e]vidence is considered speculative . . . when the party relies on subjective opinion"); *CAS Construction Co.* v. *East Hartford*, 82 Conn. App. 543, 557, 845 A.2d 466 (2004) ("[s]peculative evidence is not sufficient evidence for the trier to make a fair and reasonable estimate of the plaintiff's damages").

In his testimony, the plaintiff acknowledged that his claim for lost wages was predicated on various assumptions. For example, when asked whether it was "fair to say that you base [the calculation of lost wages in exhibit 75] on the assumption that you would have obtained [employment] at $85 an hour," the plaintiff answered, "That's one of the assumptions, yes."

Even more significantly, the plaintiff failed to produce sufficient nonspeculative evidence that he would have secured the positions detailed in exhibit 70, which listed various consultants placed by the corporation. At trial, Valenski was asked to describe the process of securing a placement with one of the corporation's clients. He testified that it involved "all kinds of competition. You have to find a manager who's looking for an opening for an [information technology] programmer kind of person. Then you put the phone down. You have to go run around, try to do recruiting, try to find a candidate. You submit the candidate's resume. The manager looks at it. Half the times he gets back to you; half the times he doesn't get back to you. If he does, he interviews your candidate. There's no guarantee that

you[r] candidate's gonna get the job in any way, shape, or form because there's other firms that are interviewing other candidates. Yeah, it's a very tedious process, you know. It's not like you put a resume in and it's a guarantee that the guy's gonna get the job." Valenski also explained that there were "thousands of companies" engaged in the same business as the corporation, which made employment opportunities "very, very competitive . . . ." In addition, the plaintiff introduced into evidence an e-mail correspondence between himself and Valenski from the spring of 2009, in which the plaintiff inquired as to whether the corporation "currently . . . had any requests for services from any company." Valenski replied that "[t]here is nothing open at this time. I have marketed and networked all around and it is the worst I have seen." At that time, the United States was mired in the great recession, as DeCaprio noted in his February 25, 2013 report.

In his testimony, the plaintiff admitted that, had he applied for any of the positions detailed in exhibit 70, he would have been competing with a number of other candidates. He also testified that, to secure such employment, he would have had to submit a resume and to participate in interviews. At the same time, when asked whether it was possible that he might not have been hired for any of those positions, the plaintiff answered, "No." The plaintiff also offered his subjective opinion that "I think my past history of being employed . . . having positions in multiple companies for multiple years would prove that I'd wind up getting hired by them."

The undisputed documentary and testimonial evidence in the record nonetheless indicates that the plaintiff on numerous occasions was unsuccessful in securing employment for such positions in this particular industry during the time period in question. At trial, the plaintiff introduced into evidence a "job search log" that he created to keep track of various employment inquiries that he made in the years following his ouster from the corporation. When questioned about that job search log, the plaintiff acknowledged that he had applied for, or inquired about, hundreds of positions that he ultimately did not secure. The plaintiff also testified that he had applied for "four or five permanent positions" in his particular area of expertise, but did not obtain any of those positions. In addition, the plaintiff conceded at trial that, although he was claiming damages for lost wages, he did not subpoena or call any witnesses from any of the employers listed on exhibit 70 to establish his claim for damages. The plaintiff further did not offer any expert testimony thereon. In so doing, the plaintiff failed to remove his claim for lost wages from the realm of speculation and conjecture. See *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 76; *Viejas Band of Kumeyaay Indians* v. *Lorinsky*, supra, 116 Conn.

App. 163.

The plaintiff's lost wages calculation rests on an additional assumption—namely, that he was qualified for all of the opportunities described in exhibit 70. The record indicates otherwise.

In his testimony, the plaintiff detailed his background in "mainframe and CICS programming," explaining that his "specialty" was programming in the Vantage-One system, a computer system widely used in the insurance industry. The plaintiff testified that, at the time of the trial, he had twenty-seven years of programming experience. The plaintiff distinguished between programming and business analysis work, and admitted that he had very little experience as an analyst or as a project manager. Rather, his experience was limited to mainframe and technologies using certain languages. The plaintiff admitted that he was not qualified for business analyst positions. Valenski corroborated that testimony.

Yet, the undisputed evidence in the record indicates that the plaintiff included several business analyst placements in exhibit 70. Valenski testified that the placements with Aegon, National Life of Vermont, and Life Insurance Co. of the Southwest secured by Barbara Granata, Kim Grinsted, and Dana Robbins all were business analyst positions. Those placements comprise approximately one quarter of the placements detailed in exhibit 70. In his testimony, the plaintiff acknowledged, consistent with the foregoing evidence, that some of the positions included in exhibit 70 "might have been" for business analysts. The plaintiff's own testimony confirms that he was not qualified for such positions.

In addition, the plaintiff testified that, as of 2009, and pursuant to a dissolution of marriage decree, he had shared custody of his youngest daughter. Because of that obligation, the plaintiff testified that he "didn't want to work out of state." Valenski likewise testified that, with respect to "conditions regarding [the plaintiff's] prospective placements at other companies," his understanding was that such positions "would have to be in Connecticut in the Hartford area . . . ." Valenski testified that certain positions with the client known as "Life Insurance Co. of the Southwest" were in Dallas, Texas. The plaintiff nevertheless included positions with that client in exhibit 70.

The undisputed testimonial and documentary evidence in the record thus reveals that the plaintiff's lost wages claim was predicated on multiple assumptions. It assumed that the plaintiff would be compensated at an hourly rate of $85, despite the fact that the majority of placements described in exhibit 70 were at a different rate. His claim assumed that the plaintiff was qualified for those placements, when he admittedly was unqualified for the five business analyst placements included in exhibit 70. The plaintiff also erroneously assumed

that all placements included in that exhibit were located in Connecticut. Lastly, the plaintiff's claim for lost wages assumed that he would have secured employment if he had been apprised of the opportunities described in exhibit 70. The record lacks sufficient non-speculative evidence to substantiate those assumptions. See *Weiss* v. *Smulders*, supra, 313 Conn. 258 (assumptions underlying damages theory "must be reasonable in light of the record evidence").

The speculative nature of the plaintiff's claim for lost wages is exemplified by his testimony regarding placements with the client known as "Aegon." Exhibit 70 includes ten placements with Aegon.[15] Three of those placements were for business analyst positions, for which the plaintiff admittedly was not qualified. Of the remaining seven placements, the plaintiff testified at trial that he did not know whether five were located in Connecticut or another state. Earlier in his testimony, the plaintiff had made clear that he would only consider placements located in Connecticut.

With respect to whether he would have secured any of those seven placements, the plaintiff opined that he believed that he was qualified for those positions. He predicated that opinion on the fact that he ultimately was hired by Vertex, Inc., to perform consulting work for Aegon from October, 2011 to July, 2012. Two of the placements, however, were for service contracts that commenced two years earlier and ran from October 12, 2009 to December 31, 2010, at which time our nation was still recovering from the great recession, as noted by DeCaprio in his February 25, 2013 report. As Valenski confirmed in an e-mail correspondence that the plaintiff introduced into evidence, the market for the plaintiff's services was "the worst I have seen" at that time. Moreover, the job search log submitted into evidence by the plaintiff indicates that he unsuccessfully pursued "open positions" with Aegon in February, 2010.

As to the remaining five placements with Aegon, they all overlapped with the period of the plaintiff's consulting work at Aegon. When asked if he knew "for a fact whether Aegon would have hired you for any of [those] positions," the plaintiff testified that "I'm assuming that [Aegon] would have used the same criteria and hired me [because] it was the exact same type of work. . . . I think my past history of being employed and . . . having positions in multiple companies for multiple years would prove that I'd wind up getting hired by them." The plaintiff nevertheless conceded that he did not call anybody from Aegon to testify, nor did he subpoena such witnesses to establish his damages.[16] Furthermore, the plaintiff's testimony that he was compensated at a rate of $50 per hour for his consulting work at Aegon undermines his claim for lost wages at a rate of $85 per hour, particularly when he insisted that that those five positions at Aegon were for "the

exact same type of work." In sum, the plaintiff's claim for lost wages for placements at Aegon is plagued by numerous assumptions that are not sufficiently supported by objective, nonspeculative evidence in the record.

"Under Connecticut law, damages may not be predicated on a contingency." *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 193, 90 A.3d 219 (2014). Fatal to the plaintiff's claim for lost wages is the assumption that, because an opportunity for employment existed, he necessarily was qualified for and would have obtained that employment. There exists a critical difference between having "opportunity to apply for" a service contract and obtaining one.[17] As the court itself recognized in the midst of the plaintiff's testimony, although the plaintiff had offered his subjective opinion that he was qualified for the placements noted in exhibit 70, "that's his opinion that he was qualified for these jobs. . . . Still whether he would have gotten the job is somewhat speculative . . . ." The court nonetheless relied on that conjecture in awarding the plaintiff damages for lost wages.

In light of the foregoing, we conclude that the plaintiff has not met his burden of producing evidence of sufficient quality to permit the fact finder to award damages for lost wages without resort to conjecture or speculation. See *American Diamond Exchange, Inc.* v. *Alpert*, supra, 302 Conn. 513. The record before us lacks evidence that "allows for some objective ascertainment of the amount" of damages for lost wages that the plaintiff sustained that is "not merely subjective or speculative . . . ." (Internal quotation marks omitted.) Id., 510; see also *CAS Construction Co.* v. *East Hartford*, supra, 82 Conn. App. 557 ("[s]peculative evidence is not sufficient evidence for the trier to make a fair and reasonable estimate of the plaintiff's damages"). Because the plaintiff failed to produce sufficient nonspeculative evidence of his claimed damages, we conclude that the court improperly awarded the plaintiff $467,786 for lost wages in the present case.

### III

The defendant claims that the court erroneously awarded the plaintiff $18,149 in damages attributable to certain tax penalties the plaintiff sustained. Although the defendant does not dispute the court's finding that the plaintiff incurred those tax penalties, he argues that "[t]he error in the 'lost wages' award tainted the conclusion that [the defendant] also caused [the plaintiff's] tax penalties." We do not agree.

In this case, the court rendered judgment in favor of the plaintiff. In this appeal, the defendant does not contest his liability under the first six counts of the operative complaint. The court in its memorandum of decision specifically found that the defendant seized

control of the corporation and wrongfully locked the plaintiff out. Through his actions, the court found that the defendant committed various torts against the plaintiff by interfering with the plaintiff's business relationships, breaching his fiduciary obligation to the plaintiff, breaching the implied covenant of good faith and fair dealing between the parties, breaching the standards of a corporate director under § 33-756, and breaching the standards of a corporate officer under § 33-765.

At trial, the plaintiff testified that, as a result of the defendant's conduct in locking him out of the corporation and refusing to provide distributions from the corporation, he "had to drain money out of my 401—my IRA account in order to survive and pay bills."[18] Specifically, the plaintiff testified that he withdrew approximately $170,000 from his 401 (K) account. As a result, he incurred tax penalties for those withdrawals. The plaintiff introduced into evidence approximately seventy pages of statements from his Scottrade IRA account, which verified the plaintiff's testimony with respect to those withdrawals. Also admitted into evidence were redacted copies of the plaintiff's personal tax returns for the years 2007 through 2012. Passacantano likewise testified that the plaintiff sustained tax penalties as a result of those withdrawals, which were reflected on those tax returns.[19] The court expressly credited that testimony in its memorandum of decision.

In his three sentence discussion of this issue in his appellate brief, the defendant argues that because the court's award for lost wages must be vacated, its award for tax penalties too must fail. He provides neither authority nor analysis in support of that contention. To the contrary, we conclude that the record amply supports the court's finding that the plaintiff sustained tax penalties as a result of the defendant's actions. The court found the defendant liable for numerous acts of tortious conduct against the plaintiff, and the plaintiff presented the aforementioned evidence indicating that he suffered tax penalties as a result. We therefore cannot conclude that the court's award of damages with respect to those tax penalties is clearly erroneous.

IV

The defendant also contends that the court erroneously awarded the plaintiff $103,835 in damages for obligations that the plaintiff owed to his former wife in his marital dissolution proceeding. More specifically, he claims that the court's finding that the plaintiff "owed $103,835 to his ex-wife" is clearly erroneous. The defendant further claims that, even if the court's award is broadly construed as compensation for legal fees incurred in connection therewith, the plaintiff still cannot prevail. We agree.

A

We first consider the defendant's challenge to the

court's finding that the plaintiff "owed $103,835" to his former wife. Neither the plaintiff's original complaint served on the defendant in February, 2010, nor the operative complaint he filed following the completion of his case-in-chief contain any allegation as to obligations to his former wife. At trial, the plaintiff produced no evidence as to the amount of any such obligations.

In its memorandum of decision, the court found that "[b]ecause of [the plaintiff] being involuntarily separated from [the corporation] by [the defendant], he . . . was not able to pay alimony and other costs of [the plaintiff's] divorce and will have to pay them." The court thus awarded the plaintiff $103,835 in damages for "[o]bligations [he] has to fulfill pursuant to the marriage dissolution case  . . . ." The defendant filed a motion for articulation with respect to that portion of the damages award, which the court denied.[20] The defendant thereafter filed a motion for review with this court, which granted the motion and ordered the trial court to articulate, inter alia, "the factual and legal basis for awarding the plaintiff $103,835 attributable to 'alimony and other costs of [the plaintiff's] divorce.' "

In its June 19, 2015 articulation, the court stated that "[a]ccording to [the plaintiff], and not disputed by [the defendant], [the plaintiff] owed $103,835 to his ex-wife in his divorce case, the judge in that case delaying enforcement of the payment to [her] until the instant case was decided. [The plaintiff] was in a position where he was unemployed because of the actions of [the defendant] and was unable to pay his alimony to his [former] wife. This was not disputed by [the defendant] and [the plaintiff] was in arrears in his divorce case because of the actions of [the defendant] resulting in [the plaintiff's] unemployment. This was based upon the testimony of [the plaintiff] which was not disputed."

We carefully have reviewed the voluminous record and can find no support for the court's finding that the plaintiff "owed $103,835 to his ex-wife" pursuant to the marital dissolution proceeding. Although the plaintiff included that exact sum in his written list of damages that was admitted into evidence as exhibit 87,[21] he testified unequivocally at trial that this sum was attributable to "over $100,000 in legal fees" he incurred in his postdissolution marital proceedings. The plaintiff testified that, following his ouster from the corporation, he initiated an alimony modification proceeding in March, 2010, which continued for years.[22] He thus sought as damages all legal fees he incurred in those proceedings. Admitted into evidence was an affidavit of attorney's fees filed by the plaintiff's attorney in those postdissolution proceedings, I. David Marder, who averred that his billing records indicated an outstanding balance of $76,772.84 as of September 29, 2013. Marder's billing records, which accompanied that affidavit, reflect a total of approximately $84,000 for professional services

rendered, expenses, and surcharges.

Put simply, there is no evidence in the record to substantiate the court's finding that the plaintiff owed his former wife $103,835. That finding, therefore, is clearly erroneous.

In an attempt to salvage the award of $103,835 in damages related to his postdissolution proceedings, the plaintiff on appeal suggests that the court found that, as a result of the defendant's conduct, he "was forced to engage in actions in the family court at a heavy cost, which included seeking a modification of his alimony," which resulted in the aforementioned legal fees. The trial court, however, made no such findings. Rather, it specifically found that the plaintiff "owed $103,835 to his ex-wife in his divorce case  .  .  .  ." As we have observed, "it is axiomatic that this appellate body does not engage in fact-finding. Connecticut's appellate courts cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts." (Internal quotation marks omitted.) *Hogan* v. *Lagosz*, 124 Conn. App. 602, 618, 6 A.3d 112 (2010), cert. denied, 299 Conn. 293, 11 A.3d 151 (2011). In the present case, the findings necessary to substantiate the award of damages are lacking. The court's award of $103,835 in damages was founded on its finding that the plaintiff owed his former wife that sum pursuant to his marital dissolution obligations. Because that finding is not supported by the evidence in the record, that portion of the award of damages is clearly erroneous.

B

To be clear, the plaintiff testified that he sought an award of $103,835 for *legal fees* he incurred in his postdissolution marital proceedings. Even if the court had rendered such an award—which its June 19, 2015 articulation indicates it plainly did not—there is a paucity of objective evidence in the record on which to predicate such an award. Marder's affidavit does not substantiate the plaintiff's claimed $103,835 in legal fees, but rather falls tens of thousands of dollars shy of that sum. The sole reference to that precise sum is contained in exhibit 87—the list of damages prepared by the plaintiff. See footnote 4 of this opinion. At trial, the plaintiff likewise testified that exhibit 87 included "over $100,000 in legal fees" he incurred in his postdissolution marital proceedings. The plaintiff provided no evidence to substantiate that sum.

In addition, the plaintiff provided no evidence to establish a basis on which the trier of fact reasonably could conclude which portion of Marder's legal fees for services rendered in those postdissolution proceedings were related to the plaintiff's loss of income as a result of being locked out of the corporation. Marder's itemized billing statements, which were admitted into evi-

dence at trial, indicate that the plaintiff had accrued more than $6000 in legal fees in his postdissolution proceedings as of June, 2009—months *prior* to being locked out of the corporation. The defendant in the present case also submitted into evidence records from the postdissolution proceedings to demonstrate that they involved numerous issues unrelated to the plaintiff's ouster from the corporation.[23] Furthermore, the defendant furnished the court with a copy of the May 30, 2014 decision of the Superior Court on certain post-judgment motions in the plaintiff's marital dissolution case, including various motions for contempt filed by the plaintiff's former wife. In a thorough, seventy-one page memorandum of decision, that court, inter alia, found the plaintiff in contempt for (1) failing to make child support payments when "he had the ability to do so" while "earning $100,000 or more, annualized, at Vertex and Mass Mutual"; (2) failing to comply with a court order requiring him to timely transfer certain retirement funds to his former wife; (3) failing to sell certain assets within a reasonable time; (4) failing to pay his children's unreimbursed medical expenses; and (5) failing to comply with his obligation to pay for his daughter's college expenses when "[t]he evidence does not show . . . that he lacked sufficient funds" to do so. In requesting compensation in this case for the entirety of his legal fees incurred in those postdissolution proceedings, the plaintiff offered no evidence or explication as to precisely how the defendant's conduct related to Marder's legal representation on such issues. Much like his claim for lost wages, the plaintiff's claim for reimbursement of Marder's legal fees in the present case amounted to little more than wild conjecture, which cannot serve as the basis for an award of damages. See *American Diamond Exchange, Inc.* v. *Alpert*, supra, 302 Conn. 510.

The record before us lacks evidence to substantiate the court's award of $103,835 in damages for obligations that the plaintiff owed to his former wife in his marital dissolution proceedings. That award, therefore, is clearly erroneous.

V

The defendant also contests the court's legal conclusion that CUTPA applied to the present dispute between officers and equal shareholders of a corporation. He claims that, under established Connecticut law, CUTPA does not apply to such intracorporate conflicts. Because he challenges the court's interpretation of CUTPA, our review is plenary. See *Votto* v. *American Car Rental, Inc.*, 273 Conn. 478, 483, 871 A.2d 981 (2005).

General Statutes § 42-110b (a) provides in relevant part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Our Supreme Court has held that "purely intracorporate

conflicts do not constitute CUTPA violations . . . ." *Ostrowski* v. *Avery*, 243 Conn. 355, 379, 703 A.2d 117 (1997); accord *Russell* v. *Russell*, supra, 91 Conn. App. 646 ("no CUTPA violation had been established" because "this dispute essentially was between two private parties and . . . concerned their jointly owned business, and, therefore, did not affect the public at large"). The present case involves an intracorporate dispute between officers and equal shareholders of a corporation. The court found, and the record reflects, that this dispute originated with the defendant's commencement of an action to dissolve the corporation in late October, 2009, and concerns his subsequent conduct in locking the plaintiff out of the corporation.

Although CUTPA generally does not apply to intracorporate conflicts, an exception to that rule exists when a defendant's actions "went well beyond governance of the corporation, and placed him in direct competition with the interests of the corporation." *Fink* v. *Golenbock*, 238 Conn. 183, 213, 680 A.2d 1243 (1996). That exception is implicated when the conduct of a defendant has "the effect of usurping the customers, employees or assets of one business in favor of another business." *Metcoff* v. *Lebovics*, 123 Conn. App. 512, 519, 2 A.3d 942 (2010); see also *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 493–94, 656 A.2d 1009 (1995).[24] In determining whether the exception applies, the critical inquiry does not concern the relationship between individual parties within a corporation, such as the plaintiff and the defendant in the present case. *Fink* v. *Golenbock*, supra, 213. Rather, that analysis asks whether such an individual's conduct is adverse to the corporation and its interests.[25] Id.

In its terse discussion of the plaintiff's CUTPA claim, the court in its memorandum of decision found that the defendant "utiliz[ed] the corporate assets for [his] own benefits" and transferred "assets [of the corporation] to his other business . . . ." At the behest of the defendant, this court subsequently ordered the trial court to articulate that finding "by identifying the business and the assets transferred." The trial court thereafter articulated its finding as follows: "The court remembers that [the plaintiff] testified that the [defendant] had transferred assets of [the corporation] to another business owned by [the defendant]. My recollection is that the assets were described by [the plaintiff] and he described the business, but the court . . . does not recall which business it was and what assets were transferred. The court . . . used this transfer of the assets to another business owned by [the defendant] as a basis, in part, for finding that [the plaintiff] had proven the elements of his claims of a [CUTPA violation]. Where it was transferred and what assets were transferred was known by the court at the time but no amount was put on it." Thus, despite this court's order to specify the business and assets referenced in its

memorandum of decision, the trial court's articulation indicates that it could not so recall.

Mindful of the clearly erroneous standard that governs factual findings, we have scoured the ample record before us, with particular attention to the testimony of the plaintiff. We can discern no evidentiary basis for the court's finding that the defendant improperly utilized corporate assets for his own benefit or transferred assets of the corporation to another business.

The record reveals that the defendant, for more than a decade prior to the events in question, routinely withdrew his proceeds from the corporation in the form of checks to Kasica Enterprises, LLC. The plaintiff testified that the defendant "took out a substantial portion of *his share* of the monies derived from [the corporation] through his Kasica Enterprises, LLC." (Emphasis added.) The plaintiff further testified that Kasica Enterprises, LLC, was an entity formed by the defendant to save "hundreds of thousands of dollars" in the construction of a personal residence "by writing all this stuff off as a business expense."[26] There is no indication in the record that Kasica Enterprises, LLC, was a business that competed with the corporation or that the defendant's decision to allocate his portion of the corporation's profits to that entity was improper.

At trial, the plaintiff also offered testimonial and documentary evidence indicating that, in the years after locking him out of the corporation, the defendant withdrew "money from [the corporation's] savings and operating accounts, put it into his personal [banking] account, and then kept on moving money from one account to the other . . . ." Nevertheless, when the court inquired as to whether the defendant ever "used any of this money for other than corporate purposes," the plaintiff conceded that "I don't have any evidence of that." Indeed, when the issue of the defendant's handling of corporate funds arose at trial, the plaintiff explained that "[t]he purpose of . . . showing those [funds] going out of the [corporate] account and going into [the defendant's] personal account was not to say that he took that [money] and kept it for himself. What it was to show was that he emptied out our accounts making it impossible to properly manage [the corporation] at the time because he looted our bank accounts. I'm not saying he took all our money out and kept it out. He kept on moving it around and putting money back into [the corporation]."

In this case, there is no evidence to substantiate a finding that the defendant's actions placed him in direct competition with the interests of the corporation or that he "took certain actions designed to usurp the business and clientele of one corporation in favor of another." *Fink* v. *Golenbock*, supra, 238 Conn. 212; see also *Metcoff* v. *Lebovics*, supra, 123 Conn. App. 519; *Russell* v. *Russell*, supra, 91 Conn. App. 647–48; *Spector*

v. *Konover*, 57 Conn. App. 121, 133–34, 747 A.2d 39, cert. denied, 254 Conn. 913, 759 A.2d 507 (2000). Moreover, the trial court articulated no such findings in either its July 30, 2014 memorandum of decision or its June 19, 2015 articulation.

At best, the record establishes that the defendant improperly compensated himself for salary and other expenses from the general account of the corporation. DeCaprio's audit of the corporation, which ultimately resulted in a supplemental award of $140,322.55 in damages to the plaintiff, included various adjustments regarding those payments from the general account. That evidence confirms that the improprieties involved in this case concern a purely intracorporate conflict. As the plaintiff admitted in his testimony, there is no evidence that the defendant utilized assets of the corporation for anything other than corporate purposes. The present case thus is not one in which the defendant's actions "went well beyond governance of the corporation, and placed him in direct competition with the interests of the corporation"; *Fink* v. *Golenbock*, supra, 238 Conn. 213; or one in which the defendant usurped the assets of the corporation "in favor of another business." *Metcoff* v. *Lebovics*, supra, 123 Conn. App. 519. Accordingly, the court improperly determined that the exception to the general rule that CUTPA does not apply to intracorporate conflicts was implicated in this case.

VI

The defendant next claims that the court improperly awarded the plaintiff, sua sponte, $326,864 in prejudgment interest pursuant to § 37-3a. He contends that § 37-3a does not apply because the damages awarded in the present case do not concern moneys that were detained after they were due and payable. The applicability of § 37-3a presents a question of law over which our review is plenary. See *Cadle Co*. v. *D'Addario*, 131 Conn. App. 223, 243–44, 26 A.3d 682 (2011).

As a preliminary matter, we note that the court awarded prejudgment interest on four distinct aspects of its damages award—specifically, its award for (1) one half of the value of the corporation; (2) tax penalties; (3) lost wages; and (4) obligations that the plaintiff owed to his former wife in their marital dissolution proceeding. We already have determined that the latter two awards were improper and, therefore, must be set aside. See parts II and IV of this opinion. We thus consider whether the court properly awarded prejudgment interest on its award for one half of the value of the corporation and for tax penalties the plaintiff sustained.

The following undisputed facts are relevant to that inquiry. The plaintiff did not request an award of prejudgment interest in either his original complaint or his January 30, 2014 amended complaint, and at no stage in the proceedings before the trial court did the plaintiff

mention, let alone request, such interest. In a record that includes boxes of exhibits and more than 1600 pages of transcripts, the only reference to such interest comes on the final page of the court's memorandum of decision, in which the court simply states, "Sua sponte interest at 10 percent per annum, for money wrongfully withheld pursuant to . . . § 37-3a from November 1, 2009 to August 1, 2014 – $326,864." The defendant thus was not afforded an opportunity to present evidence on the propriety of that award. See *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 766, 699 A.2d 81 (1997) (in awarding interest pursuant to § 37-3a, trial court "should allow the parties, if appropriate, to submit evidence relative to the rate of interest"); cf. *Weber* v. *Fujifilm Medical Systems U.S.A., Inc.*, 933 F. Supp. 2d 285, 305 (D. Conn. 2013) ("in light of [d]efendants' evidence of the low interest rate climate in the recent past . . . awarding ten percent compounded interest [pursuant to § 37-3a] would provide an unwarranted windfall to [p]laintiff"), rev'd in part on other grounds sub nom. *Weber* v. *Tada*, 589 Fed. Appx. 563, 565–67 (2d Cir. 2014).

The defendant maintains that the court improperly concluded that § 37-3a applied in this case. Our analysis of that claim begins with the relevant statutory language. Section 37-3a (a) provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ." The statute "applies to interest as damages and allows a trial court to award interest as compensation for the detention of money . . . ." *Sikorsky Financial Credit Union, Inc.* v. *Butts*, 315 Conn. 433, 442, 108 A.3d 228 (2015). Indeed, "the primary purpose of § 37-3a [is] to compensate parties that have been deprived of the use of their money." *Sosin* v. *Sosin*, 300 Conn. 205, 230, 14 A.3d 307 (2011); see also *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 199 Conn. 683, 691, 508 A.2d 438 (1986) (§ 37-3a "is intended to compensate the prevailing party for a delay in obtaining money that rightfully belongs to him"); *Paulus* v. *LaSala*, 56 Conn. App. 139, 151, 742 A.2d 379 (1999) (purpose of § 37-3a "is to compensate plaintiffs who have been deprived of the use of money wrongfully withheld by defendants"), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000). Our Supreme Court's "earliest cases interpreting § 37-3a reveal that . . . prejudgment interest was allowed under the statute, namely, claims to recover money that remained unpaid *after it was due and payable*." (Emphasis added.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 310 Conn. 38, 51, 74 A.3d 1212 (2013).

The corollary to that principle is that § 37-3a does not provide for interest on money that is not due and payable. As this court has noted, "[§] 37-3a provides a

substantive right that applies only to certain claims. . . . It does not allow prejudgment interest on claims that are not yet payable, such as awards for punitive damages . . . or on claims that do not involve the wrongful detention of money, such as personal injury claims. . . . The statute, therefore, applies to claims involving the . . . detention of money *after* it becomes due and payable." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 739–40, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). Accordingly, "[t]o award § 37-3a interest . . . the claim to which the prejudgment interest attaches must be a claim for a liquidated sum of money" detained by a defendant. *Ceci Bros.*, *Inc.* v. *Five Twenty-One Corp.*, 81 Conn. App. 419, 428, 840 A.2d 578, cert. denied, 268 Conn. 922, 846 A.2d 881 (2004). The question, then, is whether the plaintiff's claims for one half of the value of the corporation and compensation for certain tax penalties involve the detention of moneys that were due and payable to the plaintiff.

We answer that query in the negative. The damages award for one half of the value of the corporation was not a sum already payable that the defendant withheld from the plaintiff, but rather represented the plaintiff's portion, as an equal shareholder, of the valuation of the corporation at the time that the proceeding to dissolve the corporation was commenced, which valuation was not determined until the court rendered judgment in this case. The award of $18,149 for tax penalties sustained by the plaintiff likewise was not for moneys withheld by the defendant; that award compensated the plaintiff for moneys that he was obligated to pay to the Internal Revenue Service. Neither the award for one half of the value of the corporation nor the award for tax penalties involved a liquidated sum of money that the defendant had withheld from the plaintiff.[27] See *Nelson* v. *Tradewind Aviation, LLC*, 155 Conn. App. 519, 547–48, 111 A.3d 887, cert. denied, 316 Conn. 918, 113 A.3d 1016 (2015); *Reyes* v. *Chetta*, 143 Conn. App. 758, 770, 71 A.3d 1255 (2013). For that reason, the court improperly awarded prejudgment interest on those portions of its damages award.

VII

As a final matter, the defendant claims that the award of attorney's fees should be vacated in this case, arguing that the outcome of this appeal "will significantly diminish the results obtained at trial . . . ." We do not agree.

Notably, the attorney's fees awarded to the plaintiff by the court constituted punitive damages. In its memorandum of decision, the court specifically found that the defendant was "liable to [the plaintiff] for punitive damages in the form of attorney's fees," noting that counts two through six of the operative complaint involved "intentional torts [on which] punitive damages

in the form of attorney's fees may be awarded . . . ." The defendant does not contest that determination.

As this court has observed, the "standard of review for an award of punitive damages is well settled. [T]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion. . . . If awarded, punitive damages are limited to the costs of litigation less taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier. . . . Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a [trier of fact]." (Citation omitted; internal quotation marks omitted.) *Nelson* v. *Tradewind Aviation, LLC*, supra, 155 Conn. App. 545.

In this case, the court found the defendant liable under all eight counts of the operative complaint. It bears repeating that the defendant in this appeal has not contested his liability under the first six counts of that complaint. As a result, the record before us contains undisputed determinations that the defendant committed various torts against the plaintiff when he locked the plaintiff out of the corporation—namely, interfering with the plaintiff's business relationships, breaching his fiduciary obligation to the plaintiff, breaching the implied covenant of good faith and fair dealing between the parties, breaching the standards of a corporate director under § 33-756, and breaching the standards of a corporate officer under § 33-765. The defendant's uncontroverted liability thereunder furnishes an adequate basis on which the trier of fact could conclude that an award of punitive damages was appropriate. In light of our extensive review of the ample record in this case, we cannot conclude that the court abused its discretion in rendering that award.

The judgment is reversed in part and the case is remanded with direction to vacate the damages award with respect to $467,786 in lost wages, $103,835 for obligations owed to the plaintiff's former wife, and $326,864 in prejudgment interest, and further to amend the damages award to reflect an award of $40,500 on the plaintiff's claim for one half of the value of the corporation. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] System Pros, Inc., also was named as a plaintiff in both the original complaint and the January 30, 2014 amended complaint. In its memorandum of decision, the court concluded that System Pros, Inc., was not a proper party to this case. Neither party challenges that determination in this appeal. We therefore refer to Majewicz as the plaintiff in this opinion.

[2] The operative counterclaim consisted of six counts alleging various transgressions on the part of the defendant. When the court rendered judgment dissolving the corporation, it ruled in favor of the defendant on that counterclaim, stating that it involved "the same issues" as those raised in the present action.

[3] The third auditor designated by the parties was Philip J. DeCaprio, Jr., a certified public accountant with more than forty years of experience. With respect to designations for what he termed "specialty work," DeCaprio testified at trial that "I'm accredited in business valuation . . . and certified in financial forensics . . . . I'm a certified valuation analyst . . . . I'm a certified forensic accountant . . . and I'm also a diplomat of the American Board of Forensic Accountants."

[4] Titled "Majewicz vs. Kasica Damages," exhibit 87 states in full:

"Lost Wages 10/1/2010 to 11/1/2013 – $533,400

"50% of Valenski Payments as of 6/30/2013 – $365,566

"401K Penalties as of 12/31/2012 – $18,194

"Damages as of 12/31/2012 – $533,700

"Administrative cost as of 12/31/2012 – $72,664

"Office Rent as of 12/31/2012 – $12,600

"Alimony Modification Costs as of 10/21/2013 – $103,835

"Custodian Fees as of 6/30/2013 – $11,588

"Attorney Fees – Golas, Golas & Golas as of 10/22/2013 – $95,000

"50% of System Pros Value as of 11/2/2009 – $355,626

"Total as of 11/1/2013 – $2,116,676."

[5] The defendant does not challenge the award of damages with respect to DeCaprio's September 5, 2014 audit of the books and records of the corporation.

[6] "[E]specially in the case of non-publicly held corporations, the valuation of shares of corporate stock can become quite complex and uncertain." *Recovery Group, Inc.* v. *Commissioner of Internal Revenue*, 652 F.3d 122, 129 (1st Cir. 2011). Although all three auditors provided valuations of the corporation, the court in its memorandum of decision elected to credit that provided by DeCaprio.

[7] On April 22, 2015, this court ordered the trial court to articulate "[t]he factual and legal basis for awarding the plaintiff one half of the value of [the corporation] as of December 31, 2012 . . . ." In its June 19, 2015 articulation, the court stated: "[The plaintiff] was an owner of [the corporation] as a stockholder of 50 percent. He was also [its] president and a 50 percent member of the board of directors with [the defendant]. He was, therefore, entitled to one half [of] the value of the corporation since he owned one half. The amount was determined either from a report of [DeCaprio] and/ or a three [certified public accountant] panel that decided the value of [the corporation]."

[8] In its memorandum of decision, the court credited both DeCaprio's testimony and his February 25, 2013 report, stating that "[h]e was a credible witness . . . . He was devoid of any bias and was independent, and he gave a good basis for his evaluation of the corporation . . . ." We further note that the court's award on the accounting count also encompassed $140,322.55 in damages stemming from DeCaprio's audit of the books and records of the corporation. That figure originates from DeCaprio's September 5, 2014 report, which the court appended to its supplemental judgment. That report catalogues various adjustments to the corporate account, which contained funds that the parties divided equally prior to the defendant's seizure of the corporation. After detailing various adjustments, the report concludes that, owing primarily to salary paid to the defendant from that account for the years 2010 through 2013, there was "a financial obligation in favor of [the plaintiff] in the amount of $140,322.55." The court rendered judgment in favor of the plaintiff in accordance with that report on September 30, 2014. Because the court's findings in this respect are substantiated by the evidence in the record, they are not clearly erroneous.

[9] The defendant also claims that the court improperly determined that (1) he breached an oral contract with the plaintiff and (2) the award was not time barred. In light of our conclusion that the award for lost wages was not established with reasonably certainty, we need not address those alternative contentions.

[10] At trial, the plaintiff described a typical consulting placement as follows: "You go into a company for a period of time. They may contract you for six months or a year. It may be for a specific project or a task that they want you to do, and when that task is done then . . . you wind up working at another company or another location."

[11] The plaintiff was employed by Vertex, Inc., to perform consulting work for Aegon from October, 2011 to July, 2012, at a rate of $50 per hour. On March 11, 2013, the plaintiff commenced employment with Massachusetts Mutual in a salaried position that paid him $100,000 annually, which position he maintained at the time of the trial.

[12] The court's award of $467,786 in damages for lost wages reflects a reduction for unemployment compensation that the plaintiff received during the period in question.

[13] That prior client was not among those listed in exhibit 70.

[14] The plaintiff instituted this action in February, 2010. Trial commenced on October 30, 2013, and continued over the course of ten additional days, concluding on January 31, 2014. Over the objection of the defendant, the court on January 28, 2014—almost two weeks after the plaintiff had rested his case-in-chief—permitted the plaintiff to file an amended complaint, which added an eighth count that, for the first time, alleged a breach of contract on the part of the defendant.

[15] Although exhibit 70 also includes an additional placement with Aegon for a person listed only as "Reese" for a three month period in 2012, Valenski testified at trial, "That's a typo. Foster Reese wasn't at Aegon. . . . [H]e worked shortly at ING, and he didn't work out." Exhibit 71, which consists of hundreds of pages of invoices from the corporation regarding the placements detailed in exhibit 70, likewise contains no documentation indicating that Reese was placed in a service contract with Aegon.

[16] The following colloquy transpired during the plaintiff's testimony on his proof of damages for lost wages:

"[The Defendant's Counsel]: [Y]ou didn't call Aegon to come and testify on your behalf, did you?

"[The Plaintiff]: Don't be ridiculous.

"[The Defendant's Counsel]: I'm not being ridiculous, Mr. Majewicz. It's you who's claiming damages for a job that you claim that for certain you would have gotten, yet you didn't bring in any placement person, any representative, or any employee of Aegon to say I would have hired that guy.

"[The Plaintiff]: That's impractical and wouldn't happen anyway.

"[The Defendant's Counsel]: You didn't even try, did you?

"[The Plaintiff]: No company is going to commit to that.

"[The Defendant's Counsel]: You didn't try. You didn't subpoena a witness. You didn't call a witness. You didn't put the witness on your witness list, did you?

"[The Plaintiff]: No, we did not."

[17] In his testimony, the plaintiff stated that "there were numerous jobs that were available to me during that period of time that I was not given an opportunity to apply for . . . and [exhibit 70 reflects] the amount of money that I would have lost as a result of not having those jobs."

[18] The record confirms that, after being locked out of the corporation, the plaintiff was unemployed for more than twenty months from January, 2010 through September, 2011.

[19] Passacantano testified that he prepared the plaintiff's personal tax returns beginning in 1993, and continued to do so for the next two decades.

[20] In his motion for articulation, the defendant stated in relevant part that "[t]he trial court did not sufficiently articulate the factual and legal basis for concluding that [the defendant] was liable to pay 'alimony and other costs of [the plaintiff's] divorce' in the amount of $103,835. . . . The court did not clearly identify what 'alimony' and/or 'other costs of [the plaintiff's] divorce' amounted to $103,835. The court appears to have accepted, in total, the amount that [the plaintiff] sought as 'Alimony Modification Costs' [on exhibit 87] based on his submission of his divorce attorney's invoices . . . . [The defendant] requests that the court articulate the factual and legal basis for its finding that [the plaintiff's] damages recoverable from [the defendant] include 'alimony and other costs of [the plaintiff's] divorce,' and identify what costs the court was referring to."

[21] That list of damages stated simply: "Alimony Modification Costs as of 10/21/2013 – $103,835."

[22] The plaintiff also acknowledged that he commenced an alimony modification proceeding in July, 2009, months before any of the transgressions at issue in this case transpired.

[23] For example, the defendant submitted into evidence Marder's affidavit of attorney's fees, in which Marder averred that his fees included work on the plaintiff's "defense of [his former wife's] motions for contempt, compel, modification and contempt . . . ." The defendant also submitted into evidence copies of Marder's itemized billing statements for work performed on

behalf of the plaintiff in his postdissolution proceedings. Those statements describe work on a wide variety of issues, including: "Preparation — child support guidelines"; "Correspondence — client re: medical insurance application date"; "Review document — ex-wife's financials"; "Research — maximum taxable earnings 2012 Social Security"; "Pleading preparation — objection to motion [filed by the plaintiff's former wife to] modify"; and "Review document — child support payment list and transmittal . . . ." The record contains no evidence linking such issues, and hence legal fees, to the conduct of the defendant.

[24] *Larsen Chelsey Realty Co.* is instructive in this regard, as it typifies this exception. As chronicled by the Supreme Court in its decision, the defendant was the president of the plaintiff realty company. *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 484. At the behest of the chairman of the plaintiff's board of directors (chairman), the defendant attempted to procure a buyer or investor for the plaintiff. Id. As the Supreme Court noted, "[o]n February 1, [the defendant] met with Barbara Pearce, president of the competing Pearce Company, to learn whether Pearce Company might be interested in buying or investing in the plaintiff. [The defendant] had been a commercial sales agent for Pearce Company in 1983, and he had a good relationship with the company and the Pearce family. At this meeting, Pearce informed [the defendant] that her company was not interested in buying or investing in the plaintiff, but she did ask whether he would be interested in taking a position with Pearce Company. At that meeting [the defendant] gave Pearce a list of the brokers working for the plaintiff. [The defendant] never discussed this meeting with [the chairman]. [The defendant] again met with Pearce on February 21, 23 and 24.

"On February 27, unbeknown to [the chairman], [the defendant] told the plaintiff's employee brokers that the [plaintiff] was going to close, and he encouraged them to contact Pearce for jobs. Meanwhile, [the defendant] prepared a letter to mail to the plaintiff's clients and business contacts. The letter, dated and mailed on March 6, 1989, stated that the plaintiff was going to cease independent operations and would merge with Pearce Company. That same day, [the defendant] wrote a letter to the New Haven board of realtors advising it that the plaintiff would be 'closing,' that he and two other realtors would be 'transferring' to Pearce Company, and that '[w]e are using the month of March to finish up all old business and to transfer any new business to [Pearce Company].' [The defendant] then began to solicit agents and sign listings on behalf of Pearce Company" (Footnotes omitted.) Id., 485–86. The defendant later "spoke to a representative of the owner of the building that leased space to the plaintiff and told her that the plaintiff was closing and moving that day." Id., 487. On those facts, our Supreme Court concluded that the plaintiff presented a "potentially viable cause of action under CUTPA" against the defendant, who "accepted a job with a competing [entity] and then, acting as a competitor, took actions that harmed the plaintiff." Id., 493–94.

[25] Accordingly, the tortious conduct perpetrated against the plaintiff by the defendant, as outlined in counts two through six of the operative complaint, has little bearing on the issue of whether this exception applies. Those issues pertain to an intracorporate conflict to which CUTPA does not apply. See *Metcoff* v. *Lebovics*, supra, 123 Conn. App. 519 ("[i]t is well settled that purely intracorporate conflicts do not constitute CUTPA violations").

[26] The plaintiff testified at trial that he prepared a document detailing the defendant's transactions with respect to Kasica Enterprises, LLC, which he furnished to the Internal Revenue Service approximately one month before the defendant moved to dissolve the corporation because "I knew that he was . . . defrauding the Internal Revenue Service."

[27] At oral argument before this court, the plaintiff's counsel stated that the trial court, in its memorandum of decision, found that the wrongful detention by the defendant commenced on November 1, 2009. When asked exactly how much money was due to the plaintiff on that date, counsel candidly replied, "I don't believe that there was a specific amount that was due at that time."