******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SHARAY FREEMAN *v.* A BETTER WAY
WHOLESALE AUTOS, INC.
(AC 38503)

DiPentima, C. J., and Prescott and Mullins, Js.

*Syllabus*

The plaintiff sought to recover damages for violation of the Connecticut
Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.) and fraudulent
misrepresentation. The plaintiff alleged, inter alia, that the defendant
automobile dealership refused to return a deposit she had paid after
she had attempted to purchase a motor vehicle from the defendant. The
listed sales price for the vehicle was $10,995, and upon test driving the
vehicle, the plaintiff signed a purchase order that set forth the purchase
price and other costs and expenses, including an initial deposit of $2500.
The plaintiff was told that her deposit would be returned if the defendant
could not secure financing for her purchase. The plaintiff used an online
loan calculator that estimated that her financing payments for the vehicle
would be approximately $320 per month for forty-two months, and
thereafter she paid the deposit. A few days later, the plaintiff was
informed by the defendant that her monthly payment would be more
than $500, more than what she could afford. The defendant's loan officer
stated that because of the plaintiff's credit history, the lending bank had
set a higher interest rate than what was permitted by law, and the
defendant had to buy down the loan to bring it within legal limits. The
plaintiff was also informed that the bank was requiring her to take out
gap insurance and a service contract for the vehicle. After the plaintiff
told the loan officer that she could not afford those payments, the loan
officer calculated a new monthly rate of $447 per month, with other
service-related fees included, which was still too expensive for the
plaintiff. When the plaintiff asked for a return of her deposit, the defen-
dant told her it was nonrefundable, but could be applied to a different
vehicle for purchase. Thereafter, the plaintiff returned to the dealership
and spoke with the defendant's finance director, who informed the
plaintiff that he had secured new financing terms and proposed monthly
payments of $334.40 for forty-eight months, six months longer than the
original term. The plaintiff declined those terms, again requested a refund
of her deposit, and when the defendant refused, the plaintiff was unable
to purchase another vehicle for about one year while she saved money
for another deposit. Following a trial, the court rendered judgment for
the plaintiff on both counts of her complaint, awarding her $2500 in
compensatory damages and $7500 in punitive damages. The court also
ruled that the plaintiff was entitled to attorney's fees, but set a future
hearing to determine the amount. From the trial court's judgment, the
defendant appealed to this court, claiming that the trial court erred, as
a matter of law, in concluding that the defendant violated CUTPA and
committed fraudulent misrepresentation by not disclosing certain mate-
rial facts, and by awarding the plaintiff punitive damages and attorney's
fees. Following the filing of the appeal, the trial court awarded the
plaintiff $26,101.50 in attorney's fees, but the defendant did not amend
its appeal to challenge that award. *Held*:

1. The portion of the defendant's appeal challenging the trial court's award
   of attorney's fees was dismissed: it is well settled that an appellate court
   lacks jurisdiction to review an award of attorney's fees until the trial
   court actually determines the amount of those fees, and the trial court
   here having issued a postjudgment award of attorney's fees following
   the defendant's initiation of its appeal, and the defendant having failed
   to amend its appeal once that award was issued, this court did not
   have subject matter jurisdiction over the defendant's claim because the
   specific amount of attorney's fees was not properly before the court.

2. The trial court properly applied the law to the facts in the case and
   found that the defendant violated CUTPA: the evidence in the record
   demonstrated that the defendant violated the public policies behind the
   federal Truth in Lending Act (15 U.S.C. § 1601 et seq.) and the relevant
   regulation (§ 42-110b-28 [b] [1]) of state agencies by failing to disclose

the financing terms to the plaintiff before requiring that she place her deposit, and that the defendant's conduct was unethical because it only offered the plaintiff financing deals that either included unwanted products and services, a higher sales price, or both, and provided a misleading assurance regarding the refund of the plaintiff's deposit to induce the plaintiff to pay the deposit; furthermore, the record also supported the determination that the plaintiff suffered an ascertainable loss of her $2500 deposit, as having a dealership credit was not the equivalent of having full use of the money.

3. The trial court did not abuse its discretion in awarding the plaintiff punitive damages after finding that the defendant acted in reckless disregard of the plaintiff's rights and that it did so in order to augment its profit, as those findings were fully supported by the record; the defendant never presented a financing package to the plaintiff that contained only the items that she had agreed to purchase at the price she had agreed to pay.

4. The trial court properly determined that the defendant committed fraud by nondisclosure of material facts: there was ample evidence that the defendant perpetrated a fraud against the plaintiff by failing to disclose material facts regarding the financing of the vehicle and the plaintiff's deposit, as the refundability of the plaintiff's deposit and how it tied into the terms of the financing and the levying of extra costs to recoup the defendant's buy down were never disclosed to the plaintiff and the defendant misled the plaintiff into paying the deposit.

Argued March 28—officially released July 18, 2017

(Appeal from Superior Court, judicial district of
Hartford, Huddleston, J.)

*Procedural History*

Action to recover damages for, inter alia, violation of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the defendant was defaulted for failure to comply with a court order; thereafter, the court, *Huddleston, J.*, granted the defendant's motion to open the judgment; subsequently, the matter was tried to the court; judgment for the plaintiff; thereafter, the court denied the defendant's motion to reargue, and the defendant appealed to this court; subsequently, the court granted in part the plaintiff's motion for attorney's fees and costs. *Dismissed in part; affirmed in part.*

*Kenneth A. Votre*, for the appellant (defendant).

*Richard F. Wareing*, with whom was *Daniel S. Blinn*, for the appellee (plaintiff).

*Opinion*

MULLINS, J. The defendant, A Better Way Wholesale Autos, Inc., appeals from the judgment of the trial court rendered in favor of the plaintiff, Sharay Freeman, on her complaint. On appeal, the defendant claims that the court erred, as a matter of law, in concluding that (1) the defendant violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. (CUTPA), (2) an award of punitive damages was appropriate, (3) the defendant committed fraudulent misrepresentation by nondisclosure of material facts, and (4) an award of attorney's fees to the plaintiff was appropriate. We dismiss for lack of a final judgment that portion of the appeal contesting the award of attorney's fees[1] and otherwise affirm the judgment of the trial court.

The parties stipulated to the following facts before the trial court. "The defendant is a Connecticut corporation that operates a motor vehicle dealership in Naugatuck [(dealership)] . . . . It advertised a 2007 Honda Odyssey EX-L [(vehicle)] for sale at a price of $10,995. The plaintiff paid a $2500 deposit for the vehicle on February 18, 2013. She submitted a credit application to obtain financing for the vehicle. The defendant forwarded the plaintiff's credit application to two financing companies, American Credit and United Consumer Finance. The plaintiff did not agree to the terms offered to her and did not purchase the vehicle. Before bringing this action, the plaintiff requested a refund of her deposit, but the defendant refused to return it."

In addition to the parties' stipulation, the court also found the following relevant facts. The plaintiff was in need of reliable transportation to get to work and to transport her children. When she saw the defendant's advertisement for the vehicle, it was priced approximately two thousand dollars less than other comparable vehicles. She telephoned the dealership to make sure the vehicle still was available. Upon finding that it was available, she rented a car to drive from Manchester to Naugatuck in order to test drive the vehicle.

When she arrived at the dealership in Naugatuck, the plaintiff met with Alex Pierre, a salesman, and inquired as to what costs she would incur in addition to the price of the vehicle if she were to purchase it. Pierre told her that she would have to pay a conveyance fee, registration, sales tax, and finance charges for the vehicle. Pierre also told the plaintiff that she would have to put down a deposit of $2500 to initiate the credit approval process. He also told her that the deposit would be refundable if the credit application was not approved; otherwise, the deposit would be nonrefundable.

On February 16, 2013, the plaintiff signed a retail purchase order (purchase order) for the vehicle. The

purchase order set forth a cash purchase price for the vehicle of $10,995, a VIN etch service fee of $198, a dealer conveyance fee of $598, sales tax of 6.35 percent, an unspecified amount for registration of the vehicle, which the plaintiff reasonably expected to be under $150, and the plaintiff's deposit of $2500. The order did not show any financing information or other charges. The plaintiff placed her initials near each of the listed fees. Just under the area that showed the plaintiff's deposit was the statement, "NO REFUND OF DEPOSIT." Notwithstanding that statement, Pierre told the plaintiff that her deposit would be returned if the defendant could not secure financing for the plaintiff's purchase of the vehicle.[2] The plaintiff, however, did not put down her deposit at that time.

After leaving the dealership, the plaintiff used an online loan calculator to determine the amount of her monthly payments over a forty-two month term. Taking the purchase price of $10,995, and adding the additional fees and costs as set forth on the purchase order, and then subtracting the required $2500 deposit, the plaintiff determined that her monthly payments would be approximately $320 per month, assuming the maximum possible interest rate of 19 percent; see General Statutes § 36a-772.[3] She believed she could afford a monthly payment in this amount.[4]

On February 18, 2013, the plaintiff returned to the dealership and paid the $2500 deposit. Pierre told the plaintiff that the dealership would process her application and let her know whether she was approved, which he did a few days later. Pierre told the plaintiff to bring in her W-2 form and an insurance card for the new vehicle. The plaintiff obtained insurance, and brought a copy of her W-2 form and her insurance card to the defendant. Because the plaintiff recently had received an increase in her income, which was not reflected on her W-2 form, her credit approval was delayed until she could obtain additional documentation.

On February 23, 2013, the plaintiff traveled back to the dealership, where she met with Rob Italiano, a loan officer, who asked her to sign papers. The plaintiff asked Italiano how much her monthly payment would be, and he told her that it would be more than $500. The plaintiff was shocked that the cost was so much higher than her calculations and much higher than she could afford. Italiano told her that because of her credit problems, the bank had set her interest rate at 26 percent, and, because Connecticut law does not permit a rate higher than 19 percent, the defendant had to buy down the loan to get it within the legal limits. He also told her that the bank was requiring her to take out gap insurance and a service contract for the vehicle. The plaintiff told Italiano that she could not afford those payments.

Italiano then came back with a new monthly rate of

$447. He used two different methods to calculate that payment. One listed the sales price as $10,995, but added other service related contracts amounting to $3163. The other listed a sales price of $12,441.58, with stated sales tax of $949.58, and various service related contracts amounting to $2864. Each of these proposals required the plaintiff to pay approximately $21,292.90 over the forty-two month life of the loan, and was thousands of dollars more than she would have paid under her own calculations. Furthermore, the plaintiff did not want the service contracts, lifetime oil changes, or the tire and wheel service, each of which would have required her to drive from Manchester to Naugatuck for service. Accordingly, she asked for the return of her deposit. Pierre told her that the deposit was nonrefundable, but that it could be applied to a different vehicle. The plaintiff left the dealership without signing the sales agreement.

On March 3, 2013, the plaintiff returned to the dealership and spoke with John Albano, its finance director. Albano told the plaintiff that he had been able to secure financing within the range of the monthly payment that the plaintiff originally had sought. Albano proposed a payment arrangement of $334.40 for forty-eight months,[5] which was six months longer than the original financing, and which substantially increased the total cost to the plaintiff.[6] The plaintiff refused those terms, and, again, requested that the defendant refund her deposit. The defendant refused. As a result, the plaintiff was unable to purchase another vehicle for approximately one year, while she saved money for another deposit.[7]

In her complaint, the plaintiff alleged a violation of CUTPA and fraudulent misrepresentation. The defendant filed an answer to the complaint, and it set forth six special defenses, namely, that (1) the defendant did not violate the federal Truth in Lending Act 15 U.S.C. § 1601 et seq. (TILA);[8] (2) the defendant complied with all federal laws and maintained procedures and training reasonably adapted to avoid violation of TILA, and therefore, the plaintiff's claims were barred; (3) the defendant's actions fell outside its primary trade or business of selling automobiles, and therefore CUTPA was inapplicable; (4) the plaintiff's action was barred by the doctrine of unclean hands; (5) the defendant was not required by TILA to make any disclosures because the parties never closed the deal; and (6) the plaintiff's claims were precluded by the terms of the agreement to purchase the vehicle. The plaintiff denied each of the special defenses.

On November 20, 2014, the case was tried before the court, *Huddleston, J.* On April 1, 2015, the court issued a thorough memorandum of decision in which it found in favor of the plaintiff on both counts of her complaint, and it rendered judgment in the amount of $10,000,

consisting of $2500 in compensatory damages and $7500 in punitive damages. Additionally, the court awarded prejudgment and postjudgment interest and costs. The court also ruled that the plaintiff was entitled to attorney's fees pursuant to CUTPA and that a hearing would be held to determine those fees in accordance with Practice Book § 11-21.

Thereafter, the defendant filed a motion for reconsideration of the trial court's decision, which the court denied. On October 30, 2015, the defendant filed the present appeal. Subsequently, on March 18, 2016, the court awarded the plaintiff $26,101.50 in attorney's fees. The defendant did not amend its appeal to challenge that award. See footnote 1 of this opinion.

I

The defendant claims that the court erred, "as a matter of law," in concluding that the defendant violated CUTPA. Specifically, it argues that the plaintiff failed to allege a "particular violation of a specific statute, regulation, or other law,"[9] and that the one applicable statute, General Statutes § 14-62,[10] "was fully complied with by the [defendant]" because the purchase order provided, "in writing, that the deposit was not refundable . . . ." Furthermore, the defendant argues, the plaintiff failed to establish that she suffered an ascertainable loss. The plaintiff argues that the court properly found a violation of CUTPA because the defendant's conduct violated public policy, it was "immoral, unethical, oppressive, and/or unscrupulous," it caused injury to consumers, and it caused the plaintiff to suffer an ascertainable loss in the form of her $2500 deposit. We agree with the plaintiff.

"[Section] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . [I]n determining whether a practice violates CUTPA we have adopted the criteria [formerly] set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money . . . as a result of the use or employment of a [prohibited] method, act or practice . . . . Because CUTPA is a self-avowed remedial measure, General Statutes § 42-

110b (d), it is construed liberally in an effort to effectuate its public policy goals. . . .

"Moreover, [w]hether a practice is unfair and thus violates CUTPA is an issue of fact, to which we must afford our traditional deference." (Citations omitted; internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 880–81, 124 A.3d 847 (2015). "[When] the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Centimark Corp.* v. *Village Manor Associates Ltd. Partnership*, 113 Conn. App. 509, 523, 967 A.2d 550, cert. denied, 292 Conn. 907, 973 A.2d 103 (2009). If an appellant "challenges the court's interpretation of CUTPA, [however,] our review is plenary." *System Pros, Inc.* v. *Kasica*, 166 Conn. App. 732, 764, 145 A.3d 241 (2016).

In the present case, the court thoroughly analyzed § 42-110b[11] and carefully applied its factual findings to its analysis. Specifically, the court found that the defendant engaged in the following deceptive conduct: "The defendant expressly represented the cost of the vehicle would be $10,995, that there would be additional costs for sales tax, conveyance fees, a VIN etch fee, registration, and unspecified finance charges, and that the plaintiff's deposit would be returned if financing could not be obtained. These representations implied that there would be no other mandatory charges and that a legal rate of interest would be charged. These representations were made for the purpose of inducing the plaintiff to pay a substantial cash deposit. The plaintiff reasonably interpreted the defendant's representations to mean that her deposit would be refunded if financing could not be obtained for the vehicle at a legal rate of interest for the advertised price and only those additional charges that had been disclosed. The defendant failed to explain that the deposit would be nonrefundable if the defendant offered any financing on any terms, including terms that required the plaintiff to purchase services she did not want or to pay a price greater than the advertised price. This omission was material and induced the plaintiff to make a $2500 deposit. The defendant's conduct was deceptive and violated CUTPA." (Footnote omitted.)

The court next analyzed each of the three criteria set out by the cigarette rule and determined that the defendant violated each of them in one or more ways. As to the first criterion, the court found in relevant part: "[T]he defendant violated established *public policy* in several ways, each of which independently is sufficient to satisfy the first prong of the cigarette rule. First, *the public policy* established by federal and state truth in

lending laws requires adequate disclosure of financing terms so that a consumer can make an informed economic choice before committing to a proposed transaction. The defendant's failure to disclose financing terms before requiring a substantial nonrefundable deposit violates the public policy of fair disclosure reflected in the truth in lending laws. . . .

"[T]he defendant [also] violated § 42-110b-28 (b) (1) of the [R]egulations of [Connecticut State Agencies, promulgated by] the Department of Consumer Protection. That section provides: '(1) It shall be an unfair or deceptive act or practice for a new car dealer or used car dealer to fail to sell or lease, or refuse to sell or lease, a motor vehicle in accordance with any terms or conditions which the dealer has advertised, including, but not limited to, the advertised price.' The defendant never made the vehicle available to the plaintiff on the terms upon which she agreed to purchase it. The purchase order that she signed reflected the advertised sale price of $10,995, a VIN etch service fee of $198, a dealer conveyance fee of $598, sales tax of 6.35 percent, and an undisclosed registration fee that the plaintiff reasonably believed would be less than $150. . . . She was never offered financing for a transaction including those terms and only those terms. The installment contracts offered to her at a monthly payment rate of $447.45 included extra products and services that she had not agreed to purchase . . . and an increased price of $12,441.58 . . . . The installment contract offered to her at a monthly rate she could afford reflected a sales price of $12,500. . . . The defendant was unwilling to sell her the vehicle at the advertised price of $10,995 with no extras because it would lose money on the deal if it did so."[12] (Citations omitted; emphasis added.)

The defendant contends that it did not violate TILA and that the court erred in finding that it violated § 42-110b-28 (b) (1) of the regulations. The defendant argues that (1) the plaintiff never alleged that the defendant's actions violated TILA, and (2) the regulation applies only to "*the sale of the vehicle as advertised,*" and it "never refused to sell the vehicle to [the] plaintiff at the advertised price of $10,995." (Emphasis in original.) We disagree with both contentions.

Firstly, the court found that the defendant violated the *public policy* behind TILA, as had been argued by the plaintiff before the trial court; it did not find that the defendant violated TILA itself. The defendant also had set forth, inter alia, special defenses in which it claimed that it had complied with TILA. That issue, then, clearly was before the trial court and both parties had an opportunity to address it fully. In concluding that the defendant violated *the public policy* behind TILA, the court found that the defendant failed to disclose the financing terms to the plaintiff before requiring that she put down a $2500 deposit on a vehicle.

This fact is beyond dispute. We agree with the court that this action violated the *public policy* behind TILA. See *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, supra, 318 Conn. 880 (in assessing CUTPA violation, court must consider whether practice "offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness").

As to the defendant's contention that the court improperly concluded that it violated § 42-110b-28 (b) (1) of the regulations, we disagree. Section 42-110b-28 (b) (1) specifically prohibits a used car dealer from refusing to sell a vehicle in accordance with the terms or conditions that have been advertised, including, but not limited to, the advertised price. In this case, it is undisputed and the court expressly found that the defendant advertised the vehicle for sale at a price of $10,995. The terms disclosed to the plaintiff on the purchase order included this cash purchase price, a VIN etch service fee of $198, a dealer conveyance fee of $598, sales tax of 6.35 percent, and an undisclosed registration fee that the plaintiff reasonably believed would be less than $150. Despite the foregoing, however, the defendant then refused to sell the vehicle to the plaintiff on those terms, but, instead, required that she either pay more for the vehicle or buy additional service type contracts that she did not want.[13] We conclude that the court properly found that this conduct violated § 42-110b-28 (b) (1).

The court next applied its factual findings to the second criterion of the cigarette rule, namely, whether the conduct of the defendant was immoral, unethical, oppressive, or unscrupulous. The court specifically found that the defendant's conduct was unethical: "[T]he defendant . . . offered [the plaintiff] only [financing] deals that either included unwanted products and services or a higher sales price or both. The defendant also provided a misleading assurance regarding the availability of a refund of the deposit to induce the plaintiff to pay the deposit. Its conduct in so doing was unethical."

The defendant contends that its action in helping the plaintiff to lower "her monthly financing payment cannot be found to be immoral, unethical, oppressive, or unscrupulous." We disagree, and conclude that the record, as set forth previously in this opinion, supports the court's conclusion that the defendant's conduct was unethical.

Next, the court analyzed the third criterion of the cigarette rule by considering whether the defendant's conduct was injurious to consumers and competitors, and it found: "The defendant's advertised price of $10,995 for the vehicle was [approximately] $2000 lower

than prices for similar vehicles advertised by other dealers. This low price was intended to draw in customers, like the plaintiff, who are searching for affordable transportation. [Approximately] 30 percent of the customers shopping at the defendant's dealership have credit problems that require the defendant to turn to subprime lenders to arrange discount financing. Such financing requires the defendant to pay an 'acquisition fee' that it cannot charge back to the customer because doing so would raise the interest rate above the maximum of 19 percent allowed by law for used vehicles that are more than two years old. To make money on such a deal, the defendant must tack on extras, such as the tire and wheel service or lifetime oil changes, on which the dealership makes a profit. By requiring a deposit that it will not refund if it can obtain any type of financing, the defendant forces customers either to buy cars under terms they did not previously accept or to forfeit their deposits. The plaintiff . . . was harmed by this practice because, without the refund of her deposit, she was unable to purchase a different car for the year it took her to save enough money for a down payment.

"The defendant's conduct also harmed competitors. It advertised a low price for the vehicle, took the money the plaintiff had available for a down payment, and then forced her to choose between accepting previously undisclosed terms that added thousands of dollars to the total price or forfeiting her deposit. With either choice, the plaintiff's business was unavailable to competing dealerships that more accurately disclosed the cost of the vehicle before extracting a significant financial commitment." The defendant sets forth no argument in its brief, save for a few sentences and no analysis in a footnote set forth in its statement of facts, challenging the court's findings on this third criterion. Accordingly, we conclude that it is uncontested.

As to whether the plaintiff proved that she suffered an ascertainable loss, the court found: "The plaintiff has proved by a preponderance of the evidence that she sustained an ascertainable loss. The fact that the deposit theoretically remains available to her as a store credit does not make the money freely available to her. The plaintiff testified that when she searched the defendant's lot for an alternative vehicle, the only one that was suitable for her needs within her price range was a Saturn. When she inquired about it, she was told that it had been sold earlier in the day. Without the refund of her deposit, she was unable to purchase another car for a year because it took her that long to save up the money for a down payment."

In regards to this determination by the court, the defendant argues that the plaintiff's deposit remains with the defendant and that she may use it for another vehicle; therefore, it contends, the plaintiff has suffered no ascertainable loss. We disagree.

Our Supreme Court has explained that, under § 42-110g (a) of CUTPA, the term "ascertainable loss," "do[es] not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 612–13, 440 A.2d 810 (1981). The court further explained: "[T]he inclusion of the word 'ascertainable' to modify the word 'loss' indicates that plaintiffs are not required to prove actual damages of a specific dollar amount. 'Ascertainable' means 'capable of being discovered, observed or established.' . . . 'Loss' has been held synonymous with deprivation, detriment and injury. . . . It is a generic and relative term. . . . 'Damage,' on the other hand, is only a species of loss. . . . The term 'loss' necessarily encompasses a broader meaning than the term 'damage.' . . . Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known." (Citations omitted.) Id., 613–14.

Clearly, having lost the use of her $2500, the plaintiff suffered an ascertainable loss. The fact that she may have a credit, with a dealership with which she no longer wants to do business, that can be used to purchase a vehicle she does not want, is not the equivalent of having full use of the money. We conclude that the court properly found that the plaintiff had suffered an ascertainable loss.

After reviewing the record and the court's findings, which are fully supported by the record, we conclude that the court properly applied the law to the facts in this case, and that it properly found that the defendant violated CUTPA.

II

The defendant next claims that the court erred, "as a matter of law," in awarding punitive damages to the plaintiff. It argues: "[The defendant] did not require the plaintiff to purchase any additional add-ons or extras that she did not wish to purchase and removed all such add-ons when requested. Therefore, the evidence did not show that [the defendant] recklessly disregarded the rights of others because the [defendant] removed all add-ons as requested by the [plaintiff]. The legal conclusion of the trial court is in error." (Footnote omitted.) We disagree.

"A court may exercise its discretion to award punitive damages to a party who has suffered any ascertainable loss pursuant to CUTPA. See General Statutes § 42-110g (a). In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . Accordingly, when the trial court finds that the defendant has acted recklessly, [a]ward-

ing punitive damages and attorney's fees under CUTPA is discretionary . . . and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done. . . . Further, [i]t is not an abuse of discretion to award punitive damages based on a multiple of actual damages." (Citations omitted; internal quotation marks omitted.) *Votto* v. *American Car Rental, Inc.*, 273 Conn. 478, 485–86, 871 A.2d 981 (2005).

In this case, the court found that "the defendant's conduct was done with a reckless disregard for the rights of others and that an award of punitive damages is warranted. The defendant's agent admitted that some 30 percent of the defendant's customers have credit problems that require the defendant to find subprime lenders who will not finance the full value of the loan, but rather require the dealer to pay an acquisition fee that cannot be passed on to the customer because doing so would raise the interest rate above the percentage allowed by law. The defendant will lose money on such deals if it cannot sell extras on which it makes a profit. The extras are not offered by the sales agents who initially meet with the customers to sell a vehicle, but only later, by the finance managers, after financing has been obtained. By that time, the customer has paid a deposit that the plaintiff deems to be nonrefundable because financing was obtained. The court infers from the testimony of the defendant's agent that the plaintiff's situation was not unique, but rather reflected a regular business practice of the defendant. By offering financing bundled with unanticipated extras, at a time when the customer has made a substantial deposit, the defendant places customers in the untenable situation in which the plaintiff found herself—forced either to accept unwanted goods and services at a higher cost than the customer had expected to pay or to forfeit the deposit.

"The defendant's agent testified that, because of the discount financing, the defendant would have lost money on the sale to the plaintiff if it had provided financing on the advertised sale price without any unwanted extras. With the unwanted extras, the defendant would have made a profit of approximately a thousand dollars, but the plaintiff would have had to pay several thousand additional dollars above what she had reasonably calculated. When the plaintiff declined the extras, the defendant retained her deposit, effectively netting two and [one-half] times the amount of the profit it would have made had she accepted the extras. The court accordingly finds that the defendant's practice was used to augment the defendant's profit.

"The defendant's wrongdoing was hard to detect before the customer paid the deposit. Although the purchase order stated that the deposit was nonrefundable, the salesman assured the plaintiff that the store's policy

was to refund deposits if financing could not be obtained. By omitting material facts about the conditions under which a deposit would be refunded, the defendant concealed its actual practice from the plaintiff and, the court infers, from similarly situated customers who could obtain financing only through subprime lenders.

"The injury and damages in this case, while substantial to a customer like the plaintiff with little cash to spare, are relatively small in relation to the cost and inconvenience of litigation to recover them. An award of punitive damages of some multiple of the actual damages is appropriate to punish and deter the conduct at issue here. See *Ulbrich* v. *Groth*, [310 Conn. 375, 456–57 n.66, 78 A.3d 76 (2013)]." After making these findings, the court awarded punitive damages in the amount of $7500, or three times the compensatory damages of $2500.

The defendant claims that there was no basis for punitive damages and that the court's legal conclusion was in error. We disagree.

The court made very clear findings to support its decision to award punitive damages in this case after finding that the defendant acted in reckless disregard for the plaintiff's rights and that it did so in order to augment its profit. As the court stated: "The defendant never presented a financing package to the plaintiff that contained only the items she has agreed to purchase, at the price she had agreed to pay." On this basis, which is fully supported by the record, we conclude that the court did not abuse its discretion in awarding punitive damages to the plaintiff.

### III

The defendant next claims that the court erred, "as a matter of law," in finding that it was liable for fraudulent misrepresentation by nondisclosure of material facts. It argues that the plaintiff "failed to present clear and satisfactory evidence that [it] made any false representations as a statement of fact. . . . [The defendant] did not do or say anything illegal in obtaining the nonrefundable deposit from [the plaintiff]." We disagree.

On this claim, the court specifically found: "In this case, the defendant's salesman, in response to a direct inquiry by the plaintiff, told her that the additional expenses she would have to pay, above the sales price of the car, consisted of the dealer conveyance fee, registration, and sales tax. The purchase order further disclosed an optional VIN etching fee. To induce her to put down a $2500 deposit, the salesman assured her that her deposit would be refunded if financing could not be obtained. He did not explain to her that the dealership construed 'financing' to mean any financing, on any terms, regardless of whether those were the terms to which she had agreed. Because he volunteered

information in response to her inquiries, he had a duty fully and fairly to explain the defendant's conditional refund policy.

"From the credible evidence presented in this case, the court infers that the defendant will not offer financing on terms in which it will take a loss. In this case, it first attempted to recoup the loss that the discount financing [caused] by bundling extra services with the vehicle sales contract. It also told the plaintiff that the lender required gap insurance and a service contract. When the plaintiff declined those extras, the defendant then offered her financing with the deal stripped of all the extras—demonstrating that the extras were not lender requirements, but the defendant's own requirements—but with a sales price of $12,500 rather than the advertised price of $10,995 that the plaintiff had agreed to pay. These were, in effect, counter offers of a substituted transaction rather than an extension of credit for the deal the plaintiff believed she had accepted. The defendant nevertheless considered such counteroffers to be an extension of financing that terminated the plaintiff's right to receive a refund of her deposit.

"Having told the plaintiff that (1) her only additional charges would include the dealer conveyance fee, the registration fees, sales tax, and the VIN etching fee, and (2) her deposit would be refunded to her if financing could not be obtained, the defendant led the plaintiff to believe that she would be offered financing for the items shown on the purchase order form she signed or her deposit would be returned. The defendant knew, however, that its finance managers would not offer financing that caused the dealership to take a loss on the transaction and would not return the deposit if it made any counteroffers with financing. In the circumstances of this case, the defendant was required to explain its conditional refund practice fully and fairly. Its failure to do so caused the plaintiff to pay the deposit and then deprived her of its refund under circumstances in which the deposit should have been refunded to her. The court finds, accordingly, that the clear and convincing evidence establishes that the defendant committed fraud by nondisclosure of material facts."

After finding the defendant liable for fraudulent misrepresentation, however, the court declined to award damages on that count because the plaintiff's entitlement to damages under that theory of liability were identical to her damage award on the first count alleging a violation of CUTPA. Therefore, the court determined that it would not award damages separately on this count.

"The essential elements of an action in fraud, as we have repeatedly held, are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that

it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. . . . Fraud is not to be presumed but must be proven by clear and satisfactory evidence. . . . Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. They present, however, issues of fact. . . . The trier is the judge of the credibility of the testimony and the weight to be accorded it. . . . The decision of the trial court will not be reversed or modified unless it is clearly erroneous in light of the evidence and the pleadings in the record as a whole." (Citations omitted; internal quotation marks omitted.) *Miller* v. *Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811 (1981).

Upon review, we conclude that there was ample evidence to support the trial court's conclusion of fraudulent misrepresentation by the defendant. It is clear from the court's findings and the record in this case that the defendant perpetrated a fraud against the plaintiff by failing to disclose material facts regarding the financing of this vehicle and the plaintiff's deposit. The defendant told the plaintiff that in addition to the advertised purchase price, she would have to pay a $598 dealer conveyance fee, a VIN etching fee of $198, 6.35 percent sales tax, and an undisclosed registration fee. The plaintiff initialed each of these fees on the purchase order. The defendant told the plaintiff that it required a $2500 deposit that was refundable if financing could not be secured. The defendant did not tell the plaintiff that additional fees would be required or that her price would be higher depending upon the interest rate available.

The defendant secured financing, but at an interest rate of 26 percent, which is seven percentage points higher than the rate allowed by § 36a-772. To make the deal work then, the defendant had to buy down the loan. To recoup this cost, the defendant attempted to bundle extra services with the vehicle purchase, which the plaintiff did not want. The defendant also told the plaintiff that the lender required gap insurance and a service contract. After the plaintiff refused those extras, the defendant came back with a new offer, increasing the sales price of the vehicle to $12,500. When the plaintiff again refused and requested the return of her deposit, the defendant stated that the deposit was nonrefundable because it had secured financing for the plaintiff. We agree with the court that the refundability of the plaintiff's deposit and how it tied into the terms of the financing and the levying of extra costs to recoup the defendant's buy down were never disclosed to the plaintiff, and that the defendant clearly misled her into paying a sizeable deposit. We conclude, on the basis of these facts, that the court properly determined that the defendant committed fraud by nondisclosure of material facts.

The portion of the appeal challenging the award of attorney's fees is dismissed; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] On April 1, 2015, the court awarded the plaintiff damages, interest, costs, and attorney's fees under CUTPA. With respect to the award of attorney's fees, however, the court ruled that the plaintiff was entitled to them, but that "[t]he amount . . . [would] be determined in a later proceeding to be initiated by the plaintiff . . . ." Following the court's denial of the defendant's motion to reconsider, the defendant filed the present appeal on October 30, 2015. The trial court subsequently issued a March 18, 2016 ruling following a hearing on the merits of the plaintiff's motion for attorney's fees, and it awarded the plaintiff $26,101.50 in attorney's fees. In this appeal, the defendant raises a claim regarding the award of attorney's fees; it did not amend its October 30, 2015 appeal, however, to challenge the March 18, 2016 postjudgment order awarding attorney's fees.

Prior to oral argument in this case, we ordered, sua sponte, the parties to be prepared to address, at oral argument, the jurisdictional issue presented by the defendant's failure to amend its appeal to include the postjudgment order awarding $26,101.50 in attorney's fees. Each party had an opportunity to address this issue during oral argument.

It is well settled that this court lacks jurisdiction to review a trial court's decision to award attorney's fees until the court actually determines the specific amount of those fees. *Ledyard* v. *WMS Gaming, Inc.*, 171 Conn. App. 624, 634–35, 157 A.3d 1215, cert. granted, 325 Conn. 921,      A.3d      (2017); *Hirschfeld* v. *Machinist*, 131 Conn. App. 352, 355 n.2, 29 A.3d 159 (2011); *Burns* v. *General Motors Corp.*, 80 Conn. App. 146, 150–51 n.6, 833 A.2d 934, cert. denied, 267 Conn. 909, 840 A.2d 1170 (2003). Accordingly, a trial court's supplemental postjudgment order determining the amount of attorney's fees to be awarded to a prevailing party "may raise a collateral and independent claim that is separately appealable as a final judgment"; *Paranteau* v. *DeVita*, 208 Conn. 515, 523, 544 A.2d 634 (1988); and, if the nonprevailing party already has filed an appeal, it should amend its appeal if it wishes to challenge the postjudgment award. See id., 524. Because the defendant has not amended its appeal, this court lacks jurisdiction over its claim challenging the award of attorney's fees. See *McKeon* v. *Lennon*, 131 Conn. App. 585, 610–11, 27 A.3d 436 (dismissing portion of appeal challenging award of attorney's fees where trial court had not determined specific amount of attorney's fees prior to filing appeal), cert. denied, 303 Conn. 901, 31 A.3d 1178 (2011); *Sullivan* v. *Brown*, 116 Conn. App. 660, 661–63, 975 A.2d 1289 (dismissing, sua sponte, appeal challenging award of statutory attorney's fees and costs where trial court had not determined precise amount of attorney's fees and costs prior to defendants' filing appeal), cert. denied, 294 Conn. 914, 983 A.2d 852 (2009). Accordingly, we dismiss this aspect of the appeal.

[2] The court also noted that John Albano, the finance director for the dealership, confirmed at trial that the defendant had a policy of returning deposits if it was unable to secure financing for the desired vehicle.

[3] General Statutes § 36a-772 provides in relevant part: "(a) A retail seller of motor vehicles may charge, contract for, receive or collect a finance charge expressed as an annual percentage rate on any retail installment contract covering the retail sale of a motor vehicle in this state, which charge shall not exceed the rates indicated for the respective classifications of motor vehicles as follows: . . . (3) on sales made on or after October 1, 1987 . . . (C) used motor vehicles of a model designated by the manufacturer by a year more than two years prior to the year in which the sale is made, nineteen per cent."

[4] Although the trial court did not calculate the approximate amount of the payment in its memorandum of decision, for convenience, we do so here: $10,995 (vehicle price) + $698.18 (sales tax of 6.35 percent) + $198 (etching fee) + $598 (conveyance fee) + $150 (reasonable registration fee estimate) = $12,639.18 - $2500 (deposit) = $10,139.18. Financing the amount of $10,139.18, over a forty-two month period, at the maximum rate of interest of 19 percent, the plaintiff's expected payment would be approximately $332.34. The total approximate cost, with financing, is $16,458.28 ($332.34 x 42 months = $13,958.28 + $2500 deposit = $16,458.28).

[5] During trial, the defendant submitted exhibit A, which is a document of credit approval for the plaintiff from United Consumer Finance. That

document, which is dated February 11, 2014, contains two columns, one for the vehicle without warranty, and the other for the vehicle with warranty. Both columns list a sales price for the vehicle of $12,500.

The "without warranty" column also includes the following: tax of $793.75; registration fees of $140; down payment of $2500; VSI fee of $250; and total financed amount of $11,183.75, with payments listed at $334.40 per month for forty-eight months. Pursuant to our calculations, this equates to a total payout of $16,051.20 for the loan, plus the $2500 deposit, for a total cost, with interest, of $18,551.20.

The column entitled "with warranty," in addition to the sales price of $12,500, contains the following: tax of $902.91; registration fees of $140; down payment of $2500; VSI fee of $250; warranty of $1719; and total financed amount of $13,011.91, with payments listed at $360.27 per month for fifty-four months. Pursuant to our calculations, this equates to a total payout of $19,454.58 for the loan, plus the $2500 deposit, for a total cost, with interest, of $21,954.58.

[6] The court noted that Albano testified that "approximately 30 percent of the defendant's customers have poor credit ratings that require the defendant to seek financing from subprime lenders. These lenders may require the dealership to pay an 'acquisition fee' for such loans that the dealership cannot pass on to the customer because it would raise the interest rate above the statutory limit of 19 percent. The defendant cannot make money on such transactions unless it sells additional services. On the particular transaction with the plaintiff, the defendant would have lost money if it had not added extra charges, such as for the oil changes and service contract, that were profitable to the dealership." The court further noted: "The sales representatives who meet with the customers do not sell the 'extras.' Those are sold by the finance department after the customer has signed the purchase order. The sales representative receives a flat commission of $350, while the finance manager who sells the extras receives a commission of 4 percent of the cost of those extras. In this case, with the extras proposed by Italiano, the defendant would have made a profit of about $1000, while it would have lost money if it had offered the plaintiff financing on the original terms."

[7] The court also found that the defendant never presented the plaintiff with a finance package that contained the advertised price of the vehicle with only the fees with which she had agreed, as set forth on the purchase order. All of the packages presented by the defendant would have required the plaintiff to pay thousands of dollars more than she reasonably had calculated using the purchase order and the maximum allowable interest rate.

[8] The state's TILA provisions are set forth at General Statutes § 36a-675 et seq.

[9] Contrary to this assertion, the plaintiff clearly alleged a violation of CUTPA, § 42-110a et seq. in count one of her complaint.

[10] General Statutes § 14-62 (a) provides in relevant part: "Each sale shall be evidenced by an order properly signed by both the buyer and seller, a copy of which shall be furnished to the buyer when executed, and an invoice upon delivery of the motor vehicle, both of which shall contain the following information: (1) Make of vehicle; (2) year of model, whether sold as new or used, and on invoice the identification number; (3) deposit, and (A) if the deposit is not refundable, the words 'No Refund of Deposit' shall appear at this point, and (B) if the deposit is conditionally refundable, the words 'Conditional Refund of Deposit' shall appear at this point, followed by a statement giving the conditions for refund, and (C) if the deposit is unconditionally refundable, the words 'Unconditional Refund' shall appear at this point; (4) cash selling price; (5) finance charges, and (A) if these charges do not include insurance, the words 'No Insurance' shall appear at this point, and (B) if these charges include insurance, a statement shall appear at this point giving the exact type of coverage . . . ."

[11] General Statutes § 42-110b provides in relevant part: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

[12] The court also concluded that the defendant's actions violated § 14-62 because (1) the defendant failed to include the financing terms in the purchase order it required the plaintiff to sign and (2) the purchase order provided that the deposit was nonrefundable, while the admitted practice of the defendant, as relied on by the plaintiff when providing her deposit, was to refund a deposit if financing could not be obtained. The court found that, because the terms of financing were not disclosed fully and involved

undisclosed mandatory costs that essentially were used to hide the higher than legally permitted financing charges, the defendant violated the statute. The defendant contends that this was error as a matter of law, in part, because the plaintiff did not specifically plead the applicability of this statute. We note, however, that the court clearly found that the defendant, itself, raised this statute before the trial court and argued that it fully complied with it. The defendant does not challenge this finding on appeal. Nevertheless, because there were additional bases for the court's finding that the defendant violated the first criterion of the cigarette rule, we need not consider whether the court was correct in its determination that the defendant specifically violated § 14-62.

[13] In its appellate brief, the defendant argues in part that there was no evidence that the defendant mandated these extras, and, in fact, when the plaintiff "told the [defendant] that she was not interested in purchasing any of the extras . . . these extras were stripped from the sales [contract]." The defendant then cites to three specific pages of the trial transcript. We thoroughly have reviewed those pages and surrounding pages and conclude that the testimony on the referenced pages firmly provided that the defendant refused to remove the gap insurance, and it did not give the plaintiff any documentation about what extras it still was requiring after the plaintiff complained and asked for the return of her deposit.

The defendant first cites to page thirty-five of the transcript. A review of that page reveals the plaintiff's testimony that Italiano told her that "gap insurance and a service contract" were added to the purchase order, along with "lifetime oil changes." On the following page, we find the plaintiff's testimony that Italiano told her "that that's what the bank required to get me approved." On the next page cited by the defendant, page sixty-four of the transcript, is the plaintiff's testimony that Albano reduced the proposed payments by more than $100 per month, but the plaintiff stated that she was not aware of him removing the charges for the warranty. On the following page, the plaintiff stated that she believed the new figure still included a service contract. On the final page cited by the defendant, page seventy-two, is the plaintiff's testimony that she "was never told that any of the gap insurance was removed."

———————————————